# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1975

_____

United States of America,      *
     *
       Plaintiff-Appellant,      *
     *    Appeal from the United States
      v.      *    District Court for the
     *    Eastern District of Arkansas.
Daniel Lewis Lee,      *
also known as Daniel Lewis Graham,      *
also known as D.L. Graham,      *
also known as Danny Lee,      *
     *
       Defendant-Appellee.      *

_____

Submitted: October 17, 2001
Filed: December 14, 2001

_____

Before McMILLIAN, RICHARD S. ARNOLD, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Daniel Lewis Lee was convicted of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The jury returned a verdict of death after the penalty phase, and a sentence of death was imposed under 18 U.S.C. § 3594. Later the district court granted Lee's motion for a new penalty phase hearing. The government appeals, and we reverse.

I.

The indictment charged Danny Lee and Chevie Kehoe with a number of offenses including murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). The defendants were accused of robbing and killing a gun dealer, his wife, and their eight-year old daughter in the course of seeking funds to support the Aryan Peoples Republic. The U.S. Attorney for the Eastern District of Arkansas filed notices of intention to seek the death penalty against both defendants under 18 U.S.C. § 3593(a).

Lee and Kehoe were convicted by a jury of the three capital counts on May 4, 1999, and the district court set a separate penalty phase hearing for each defendant under 18 U.S.C. § 3593(b). The case against Kehoe went first, and the jury returned a verdict of life without release. U.S. Attorney Paula Casey informed the court on May 10 that she would like to withdraw the death notice in Lee's case but that she was uncertain whether she needed approval from the Department of Justice (DOJ) under its death penalty protocol.[1] The district court recessed the proceedings until 3 p.m. so that Casey could contact DOJ.

---

[1]The death penalty protocol, now found in § 9-10.000 et seq. of the United States Attorneys' Manual, was promulgated by DOJ shortly after passage of the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591(a) et seq. Under the protocol, a prosecutor who wishes to charge a capital count in a federal indictment must send to the DOJ Criminal Division a completed death penalty evaluation form describing the facts and evidence underlying the indictment, the theory of liability, the federal interest in the case, and any other information relevant to the charging decision. United States Attorneys' Manual § 9-10.040 (1999). The evaluation form is reviewed by the Attorney General's Review Committee on Capital Cases, whose members are appointed by the Attorney General. Id. at § 9-10.050. The review committee makes a recommendation to the Attorney General, who then decides whether the government will seek the death penalty. Id. The same procedure is used when a prosecutor wishes to withdraw a previously filed death notice. Id. at § 9-10.090.

Under the death penalty protocol, the Attorney General is the ultimate decisionmaker on the question of whether the government will seek the death penalty or withdraw a previously filed death notice. See United States Attorneys' Manual § 9-10.020, 9-10.090 (1999). When Casey called DOJ, Deputy Attorney General Eric Holder took the call and informed her that Attorney General Janet Reno was unavailable because she was at a meeting in the White House. Holder convened the other members of the DOJ review committee to participate in a telephone conference, and at its conclusion he told Casey that the death notice would not be withdrawn. Casey relayed the information to the court, and Lee's penalty phase hearing began the following morning.

Prior to the penalty phase, the government had served notice under 18 U.S.C. § 3593(a) that it would attempt to prove the nonstatutory aggravating factor of future dangerousness at Lee's hearing. The government had also disclosed that it would introduce evidence of four subjects to prove future dangerousness: Lee's involvement in the murder of Joseph John Wavra in Oklahoma when he was seventeen, Lee's threatening behavior toward a deputy sheriff during his incarceration for the guilt phase trial in this case, Lee's 1995 Florida conviction for carrying a concealed weapon, and Lee's lack of remorse. The parties had also approved instructions that would direct the jury to determine whether Lee's involvement in the Wavra murder, Lee's 1995 conviction, and Lee's lack of remorse made him a future threat to society.[2]

The government had also stated in a discovery motion before the penalty phase that it would "not introduce mental health evidence during its case-in-chief in the penalty phase...[but] would only use this evidence to rebut any mental health evidence introduced by the defendant in his case-in-chief." United States v. Lee, 89 F. Supp.

_____

[2] Although the instructions did not reference Lee's threatening behavior toward the deputy sheriff, the district court allowed the government to introduce evidence about it at the penalty hearing.

-3-

2d 1017, 1019 (E.D. Ark. 2000) (emphasis in original). Lee's counsel initially intended to rebut the government's case for future dangerousness by introducing a risk assessment of his future dangerousness performed by Lee's mental health expert, Dr. Mark Cunningham. After Dr. Cunningham was denied access to prison information he deemed critical, defense counsel decided as a matter of strategy that Dr. Cunningham would focus "strictly" on mitigation evidence concerning Lee's upbringing and environment. The government was unaware of this change in strategy and obtained permission for its own mental health expert, Dr. Thomas Ryan, to conduct a risk assessment of Lee in order to rebut the expected testimony of Dr. Cunningham.

During the voir dire of Dr. Cunningham at the penalty hearing, the government asked him about scientific techniques for conducting a risk assessment for future dangerousness. Lee objected on the basis that Dr. Cunningham was not going to present a violence risk assessment. The government responded that Dr. Cunningham's scientific views were relevant to his qualifications, and the district court overruled the objection.

Dr. Cunningham testified during his direct examination before the jury about a number of mitigating factors from Lee's upbringing that might have predisposed him toward criminal behavior: 1) Lee was a follower and under the influence of Chevie Kehoe and others at the time of the instant offenses, 2) Lee had been abandoned by his biological father, abused by his stepfather, and neglected by his mother, 3) Lee had suffered from childhood seizures, attention deficit hyperactivity disorder, and learning disabilities, 4) Lee began abusing alcohol and drugs at an early age, and 5) Lee had been diagnosed with a potential borderline personality disorder and other psychological dysfunctions.

The government began its cross examination by questioning Dr. Cunningham about his psychological diagnosis of Lee and Lee's capacity for violence. Lee's

counsel moved in limine to prevent the government from examining Dr. Cunningham about risk assessment and future dangerousness, arguing that he had not raised these subjects on his direct examination. The district court acknowledged Lee's concerns but denied the motion, stating:

> Well, [Dr. Cunningham] has identified himself as a clinical and forensic psychologist with a Ph.D. degree. He has had an intimate investigation of the defendant, so I think [the prosecutor] should be able to ask him in his opinion if he is dangerous. Now, he can handle himself. If it's in the area of his expertise and considering what has been revealed about his intimate knowledge of the man, he can inquire. I think the expert is fully capable of explaining why he can't answer certain of these questions.

The government then continued to examine Dr. Cunningham concerning Lee's violence, and Lee's counsel did not register any further objections.

Lee's counsel moved at the end of the trial day to limit the scope of the testimony to be given by the government's rebuttal expert, Dr. Ryan, seeking to exclude the topics of risk assessment, future dangerousness, and psychopathy. The district court deferred a ruling on this second motion in limine, but told counsel:

> We will leave it to the defendant to object as to his [i.e. Dr. Ryan's] testimony when it gets to the point you say, stop, it's not rebuttal. And I'll have to make a judgment as to whether it is or not. I'm not going to let the government put on its case on rebuttal that it should have put on in direct. If it's strictly rebuttal, there will be no problem.

Dr. Cunningham completed his cross examination on the following day when he testified about past acts by Lee, including episodes in which he had physically abused a girlfriend, assaulted his sister, committed burglary and arson, assaulted inmates and patients at various facilities, and treated blacks more poorly than whites.

The government also asked him about psychopathy and whether Lee could be diagnosed a psychopath. The cross examination concluded without further objection by Lee's counsel.

Before Dr. Ryan took the stand, Lee's counsel requested a ruling on her motion to limit his testimony. The government argued that effective rebuttal required that it be permitted to ask about Lee's violence and potential psychopathy. During the discussion with the court, Lee's counsel said: "By the way, I was assuming that I had an ongoing objection because of my motion so I didn't stand up and object every time." The district court indicated that it understood that, and after a recess it partially granted Lee's second motion in limine. The court barred Dr. Ryan from testifying "with respect to the issue of psychopathy, the Hare psychopathy test, and any reference to the defendant being a, quote, psychopath, unquote, on the basis that such would not be proper rebuttal." The court also indicated that it regarded the motion in limine to be "moot with respect to risk assessment analysis performed by Dr. Ryan because the government has indicated that it will not offer such testimony." The court declined to rule out other topics, such as matters raised in the government's case in chief for future dangerousness: "I will deal with the other issues with respect to whether future testimony is appropriately considered to be rebuttal on a question and answer basis if objections are raised."

Dr. Ryan took the stand, and the government questioned him about Lee's medical and psychological diagnoses. When the government asked whether Lee showed any remorse for his actions, his counsel objected. The district court overruled the objection: "It's borderline, but I'm going to let you go that far." The government's examination of Dr. Ryan concluded without further objection.

The jury returned a verdict of death on May 14, 1999. On the next business day, the district court wrote to counsel raising the question whether Deputy Attorney General Holder had had authority to deny the withdrawal of Lee's death notice and

requested briefing on the issue. The court stated that "no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe." Lee then moved under Fed. R. Crim. P. 33 and 35 to set aside the death verdict and for a new penalty hearing. He claimed that the government had repeatedly violated the court's order limiting testimony concerning future dangerousness, had violated a plea agreement whereby Lee would plead to life without release if the government did not pursue the death penalty,[3] and had breached its death penalty protocol when the Deputy Attorney General acted in the Attorney General's absence. Lee also moved to compel testimony from Attorney General Reno and Deputy Attorney General Holder about why the Attorney General had been gone and how the protocol was administered in her absence. The district court granted the subpoenas, and Reno and Holder petitioned for a writ of mandamus. This court granted the writ, quashed the subpoenas, and remanded for further proceedings. In re United States, 197 F.3d 310, 316 (8th Cir. 1999).

On remand there was additional briefing before the court issued its order for a new penalty hearing. In the order, the district court said it would set aside "as a nullity" Deputy Attorney General Holder's decision not to withdraw the death notice and ruled that Lee had a right to force DOJ to comply with the death penalty protocol. Lee, 89 F. Supp. 2d at 1041. The court ordered that DOJ "fully and properly comply" with the protocol in reconsidering the U.S. Attorney's request to withdraw Lee's death notice. Id. If the Attorney General were to agree to withdraw Lee's death notice, the court would sentence Lee to life without release. Id. If the Attorney General did not withdraw Lee's death notice, the court would grant Lee a new penalty phase trial. Id. at 1042 (regardless of whether or not there had been full compliance with the protocol). The conditional new trial order was based on the court's conclusions that Lee had enforceable rights in the protocol, that they had been violated, and that the

---

[3] In a ruling on June 30, 1999, the district court rejected Lee's claim that there had been a plea agreement.

court had erred in permitting the government to introduce aggravating evidence of Lee's past bad acts and potential psychopathy on cross examination and rebuttal, thus depriving Lee of advance notice of the evidence to be used against him at sentencing and in contravention of the government's prehearing statement and approval of jury instructions. The government then filed this appeal.

## II.

The United States argues on appeal that the district court abused its discretion in ordering a new penalty trial because (1) individuals have no enforceable rights in the DOJ death penalty protocol, (2) the district court did not commit error, much less plain error, in admitting testimony concerning Lee's past bad acts and potential psychopathy on cross examination and rebuttal, (3) the district court should not have applied Federal Rule of Evidence 611(b) in its post hearing analysis of the evidence at Lee's capital sentencing hearing, (4) Lee had no right to advance notice of the evidence the government would introduce at the penalty phase, and (5) the government's evidence was not limited by its prehearing statement or acceptance of jury instructions. Lee responds that the district court did not abuse its discretion because its order was based on proper grounds, although Lee's counsel conceded at oral argument that the remedy for violation of the death penalty protocol would be resubmission of the withdrawal request to the Attorney General, not a new penalty trial.

## A.

The district court's order for a new penalty trial was conditioned on whether or not DOJ would withdraw Lee's death notice. The predicate for this order was the court's conclusion that the government had breached the protocol when Deputy Attorney General Holder acted in the Attorney General's absence and made the decision not to withdraw Lee's death notice and that Lee had a right to enforce

compliance with the protocol under the <u>Accardi</u> doctrine.  <u>See</u> <u>United States ex rel.</u> <u>Accardi v. Shaughnessy</u>, 347 U.S. 260 (1954).

When this case was last before us, we recognized that the <u>Accardi</u> doctrine bars administrative agencies from taking action "inconsistent with their internal regulations when it would affect individual rights," but we noted that "[n]o case has ever held that the <u>Accardi</u> doctrine applies to the internal regulations of the DOJ." <u>In re United States</u>, 197 F.3d 310, 315 (8th Cir. 1999).  <u>See</u> <u>also</u> <u>United States v. Williams</u>, 504 U.S. 36 (1992); <u>United States v. Myers</u>, 123 F.3d 350 (6th Cir. 1997); <u>United States v. Gillespie</u>, 974 F.2d 796 (7th Cir. 1992); <u>United States v. Pacheco-Ortiz</u>, 889 F.2d 301 (1st Cir. 1989).  Courts have agreed that individuals have no enforceable rights under another internal DOJ policy known as the <u>Petite</u> policy, which restricts federal prosecution of individuals already prosecuted under state law for the same act or acts.   <u>See</u> <u>Delay v. United States</u>, 602 F.2d 173, 178 (8th Cir. 1979); <u>United States v. Hayes</u>, 589 F.2d 811, 818 (5th Cir. 1979); <u>United States v. Thompson</u>, 579 F.2d 1184, 1189 (10th Cir. 1978); <u>United States v. Hutul</u>, 416 F.2d 607, 626 (7th Cir. 1969).  Prosecutorial discretion has been treated differently than other types of agency discretion, <u>see</u> <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996), and the special nature of prosecution is the reason that the <u>Accardi</u> doctrine has not been applied to criminal law enforcement policies and procedures.  <u>Compare</u> <u>United States v. Caceres</u>, 440 U.S. 741 (1979) (not applicable to evidence obtained in violation of internal IRS regulations governing electronic surveillance), <u>with</u> <u>Yellin v. United States</u>, 374 U.S. 109 (1963) (applicable to procedures governing investigation by congressional committee).

The DOJ Manual, which contains the death penalty protocol, expressly states that it does not create substantive or procedural rights enforceable by others and that it does not limit DOJ's lawful "prerogatives":

> The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice.

United States Attorneys' Manual at § 1-1.100. Federal courts have held this disclaimer to be effective. See Nichols v. Reno, 124 F.3d 1376 (10th Cir. 1997); United States v. Busher, 817 F.2d 1409, 1411-12 (9th Cir. 1987). Cf. United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990) (DOJ Handbook on the Comprehensive Crime Control Act of 1984 does "not confer substantive rights on any party"). The disclaimer also puts criminal suspects and defendants on notice that they lack enforceable rights in DOJ policies and procedures.

We agree with those courts which have concluded that the death penalty protocol is unenforceable by individuals. See Nichols v. Reno, 124 F.3d 1376 (10th Cir. 1997), aff'g 931 F. Supp. 748 (D. Colo. 1996); Walker v. Reno, 925 F. Supp. 124, 134-35 (N.D.N.Y. 1995). Since the death penalty protocol does not create individual rights that Lee can enforce, any violation of it was not a basis on which the district court could issue its conditional order for a new penalty hearing.

B.

The order for a new penalty hearing was also based on the district court's previous evidentiary rulings. The standard of review for a new trial order is abuse of discretion. United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988). The government argues that the district court abused its discretion in ordering a new trial on these grounds since its original rulings at Lee's penalty hearing were not erroneous and certainly not plain error. The plain error standard is used to decide whether to grant a new trial if a defendant has failed to preserve an alleged error at the sentencing phase. Id. at 1319. See also Fed. R. Crim. P. 52(b) (court may take

-10-

judicial notice of plain errors "not brought to the attention of the court"). Generally a party must object to evidence at the time it is introduced in order to preserve an alleged error. McBride, 862 F.2d at 1319. A motion in limine is not a substitute for an objection and does not alone preserve error for review. United States v. Roenigk, 810 F.2d 809, 815 (8th Cir. 1987). If alleged errors have been adequately preserved, a new trial may be granted "if the interests of justice so require." Fed. R. Crim. P. 33.

In this case the trial court was satisfied that Lee sufficiently preserved his evidentiary objections. The court agreed that Lee had raised a continuing objection in respect to Dr. Cunningham's cross examination, the government did not contest that ruling at the time, and we see no abuse of discretion here. Lee's motion to limit the scope of Dr. Ryan's rebuttal testimony was granted in part by the district court, and Lee objected during Dr. Ryan's testimony when the government asked whether Lee had ever shown remorse for things he had done in his life. We conclude, therefore, that the standard for granting a new penalty hearing was whether the interests of justice required it.

The Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings. Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence "as to any matter relevant to the sentence." 18 U.S.C. § 3593(c). See also Williams v. New York, 337 U.S. 241, 247 (1949) (A judge or jury at a capital sentencing hearing should "not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."); Gregg v. Georgia, 428 U.S. 153, 203-04 (1976) (In a capital sentencing hearing, "it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision.").

The Federal Rules of Evidence do not control the admission of evidence in capital penalty hearings. 18 U.S.C. § 3593(c). The district court may exclude

evidence only "if its probative value is outweighed by the danger of creating <u>unfair</u> prejudice, confusing the issues, or misleading the jury." <u>Id.</u> (emphasis added). Although determining whether there is a threat of unfair prejudice is a fact specific inquiry, <u>see</u>, <u>e.g.</u>, <u>United States v. McVeigh</u>, 153 F.3d 1166 (10th Cir. 1998), the admission of evidence of unadjudicated prior offenses at a capital sentencing hearing is constitutionally permissible and not inherently prejudicial. <u>See</u> <u>Williams v. New York</u>, 337 U.S. 241 (1949); <u>United States v. Hall</u>, 152 F.3d 381, 404 (5th Cir. 1998); <u>Eaton v. Angelone</u>, 139 F.3d 990, 998 (4th Cir. 1998); <u>Hatch v. State of Oklahoma</u>, 58 F.3d 1447, 1465 (10th Cir. 1995).

The court permitted the government to elicit a number of unadjudicated past bad acts by Lee, including instances in which Lee physically abused a girlfriend, assaulted his sister, committed burglary and arson offenses, assaulted inmates and patients at various facilities, and treated blacks more poorly than whites. These acts were probative of Lee's future dangerousness, but they were also relevant to the credibility of Dr. Cunningham. Dr. Cunningham's mitigation testimony selectively presented facts about Lee's past and his upbringing to cast him in a sympathetic light. The government's cross examination permissibly tested whether Dr. Cunningham's presentation produced a distorted account.

Any threat of unfair prejudice did not outweigh the probative value of testimony about Lee's past bad acts. The acts were not substantially different in kind or degree than those brought out by the government during its case in chief. Indeed, none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case. Lee also benefitted from a limiting instruction which told the jury it could consider only future dangerousness evidence which had been brought out in the government's case in chief. Finally, the record indicates that the jury would have been justified in recommending a death sentence regardless of the unadjudicated offenses elicited from Dr. Cunningham. We conclude that the

district court did not err by admitting testimony on cross examination concerning Lee's past bad acts.

The government's cross examination of Dr. Cunningham also elicited testimony on the issue of psychopathy. Lee's potential psychopathy was probative of his future dangerousness, a subject of the government's case in chief but not of Dr. Cunningham's direct testimony. Even if the government's examination of Dr. Cunningham about psychopathy exceeded the scope of his direct, we fail to find a threat of unfair prejudice. By introducing a mental health expert in defense, Lee opened the door to testimony concerning psychological diagnosis. Moreover, the FDPA provides for a broad scope of evidence at the penalty phase in a capital case. The district court did not commit error in admitting testimony concerning psychopathy on cross examination. Since the court's evidentiary rulings in respect to Dr. Cunningham's testimony were not erroneous, a new trial was not required in the interests of justice.

Dr. Ryan's testimony comprises fifty pages in the record, and the government elicited only one statement from him about lack of remorse when he answered that Lee did not display "a lot of guilty feelings or remorseful feelings" about his actions. The government's brief examination of Dr. Ryan concerning Lee's lack of remorse exceeded the scope of Dr. Cunningham's direct testimony, but Dr. Ryan's statement fell within the wide boundaries set for the admission of evidence at capital sentencing hearings and we cannot conclude that this single comment unfairly prejudiced Lee. Since Lee was not unfairly prejudiced by the evidence, the interests of justice did not require a new trial.

The government argues that the district court relied on Rule 611(b) of the Federal Rules of Evidence to conclude that Dr. Cunningham's cross examination had exceeded the scope of direct even though these rules do not apply to capital sentencing hearings. Although the district court quoted extensively from § 3593(c)

-13-

of the FDPA, including the language limiting the applicability of the Federal Rules of Evidence, it concluded that the scope of cross examination had impermissibly exceeded direct testimony, <u>Lee</u>, 89 F. Supp. 2d at 1027-28, 1031, and cited Rule 611(b), <u>id.</u> at 1022. In contrast, the court did not appear to apply the § 3593 balancing test between probative value and unfair prejudice. Evidentiary issues in a capital sentencing hearing are controlled by the FDPA rather than the normal evidentiary rules, and the § 3593 test should have been the focus instead of Rule 611(b).

The district court also concluded that its allowance of aggravating evidence from Lee's own mental health expert was unfair to Lee because he had no advance notice of the evidence and no opportunity to respond. <u>Id.</u> at 1028. The FDPA requires the government to serve a defendant notice "setting forth the aggravating factor or factors that the government...proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a). Although Lee had a right to advance notice of the aggravating factors the government sought to prove at sentencing, Lee had no right to advance notice of the specific evidence the government would use to prove those factors.[4] <u>See</u> <u>Gray v. Netherland</u>, 518 U.S. 152, 167-68 (1996); <u>United States v. Battle</u>, 173 F.3d 1343, 1347 (11th Cir. 1999). Lee would have been unfairly prejudiced if the government had lied about the evidence it planned to introduce, <u>see id.</u> at 165, but the record contains no evidence that the government intentionally misled Lee. The FDPA also requires that "the defendant...be permitted to rebut any information received at the hearing and...be given fair opportunity to present argument as to the adequacy of the information." 18 U.S.C. § 3593(c). Lee was not denied an opportunity to respond to the government's aggravating evidence, however. Lee had his turn to offer evidence, and he could have moved for a continuance if he

---

[4] It should also be noted that the jury instructions approved by Lee before the penalty phase provided advance notice of the evidence which the government later introduced during its case in chief.

felt it necessary, see Gray, 518 U.S. at 169, or he could have sought surrebuttal, see United States v. Barnette, 211 F.3d 803, 821-22 (4th Cir. 2000) (denial of surrebuttal after introduction of new evidence is reversible error). The record does not show unfair prejudice.

The government also challenges the district court's conclusion that its evidentiary rulings had been unfair to Lee because it had permitted evidence which had diverged from the government's prehearing statement that it did not intend to introduce mental health evidence unless Lee offered it first and from the government's approval of instructions which limited jury examination of future dangerousness to its case in chief. It does not appear that the court erred or was prejudicially unfair to Lee in either respect. The government did not introduce mental health evidence during its case in chief. Only after Dr. Cunningham had testified on direct did it attempt to cross examine him on subjects touching on Lee's mental health. Dr. Cunningham is a mental health expert, and his testimony about Lee's upbringing and environment was relevant to Lee's mental health and propensity toward criminal behavior. Lee's argument that Dr. Cunningham's direct testimony was not mental health evidence because it did not encompass risk assessment or psychological diagnosis is overly restrictive. Finally, neither the district court nor Lee have cited any authority for the proposition that jury instructions approved before trial set the limits of cross examination and rebuttal testimony without consideration of how evidence was later developed at trial. Lee was not entitled to a new penalty trial on these grounds.

The record shows that the experienced district judge handled the evidentiary issues at the penalty hearing conscientiously and expertly. The district court did not err in permitting the government's cross examination of Dr. Cunningham, and Dr. Ryan's single statement on rebuttal about Lee's lack of remorse did not present a threat of unfair prejudice. After examining all of the points on which the district court relied in finding error in its admission of certain evidence at Lee's penalty

hearing, we conclude that it was an abuse of discretion to order a new hearing based on these grounds.

## III.

In sum, we conclude that Lee has no enforceable rights under the death penalty protocol and that any violation of it would not entitle him to a new penalty trial. After studying the record, we conclude that Lee is not entitled to a new penalty trial on the evidentiary issues relied on by the district court in its new penalty hearing order because (1) admission of evidence that exceeded the scope of Dr. Cunningham's direct testimony was not error, (2) Dr. Ryan's statement on rebuttal that Lee lacked remorse did not raise a threat of unfair prejudice, (3) Rule 611(b) did not control the admission of evidence at Lee's capital sentencing hearing, (4) Lee had no right to advance notice of the evidence the government would introduce at the penalty phase, and (5) the evidence introduced by the government at the penalty phase was not prohibited by its prehearing statement or preapproved jury instructions. It was therefore an abuse of discretion to order a new trial on the grounds stated.

Accordingly, the order of the district court for a new penalty hearing is reversed, and the sentence of death is reinstated.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-