# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2389

_____

United States of America,     *
           *
      Plaintiff - Appellee,     *
           *    Appeal from the United States
      v.            *    District Court for the Eastern
           *    District of Arkansas.
Daniel Lewis Lee, also known as     *
Daniel Lewis Graham, also known     *
as D L Graham, also known as     *
Danny Lee,     *
           *
      Defendant - Appellant.     *

_____

Submitted: April 15, 2004
Filed:  July 8, 2004 (Corrected July 19, 2004)

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

A jury convicted Daniel Lewis Lee of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(c) and (d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959.  The jury also returned a verdict of death and a death sentence was imposed. Lee moved successfully for a new sentencing phase of the trial; the government appealed and we reversed.[1]  Now before the court is Lee's direct appeal of his conviction and sentence.  We affirm the judgment of the district court.[2]

_____

[1]United States v. Lee, 274 F.3d 485 (8th Cir. 2001).

[2]The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

I.

The evidence presented at trial showed that Lee, Chevie Kehoe (Kehoe), his father Kirby Kehoe, his brother Cheyne Kehoe (Cheyne), and Faron Lovelace participated in a variety of criminal activities to promote and fund a white supremacist organization known as the Aryan Peoples' Republic or the Aryan Peoples' Resistence (APR). Kehoe formed the APR to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. He patterned it after an antigovernment, white supremacist organization called the Order.

Lee met Kehoe in 1995, and Kehoe recruited him into the APR. In January 1996, Lee and Kehoe left the state of Washington and traveled to Arkansas where they dressed in police raid clothing and went to the home of William Mueller, a gun dealer near Tilley who owned a large collection of weapons and ammunition. Kehoe and his father had robbed Mueller in February 1995, and Kehoe planned to find valuable property at his house. The Muellers were not at home when Lee and Kehoe arrived so they waited. When the Muellers returned, Lee and Kehoe overpowered and incapacitated Mueller and his wife. Then they questioned Nancy Mueller's eight year old daughter, Sarah Powell, about where they could find cash, guns, and munitions. After finding $50,000 in cash, guns, and ammunition, they shot the three victims with a stun gun, placed plastic bags over their heads, and sealed the bags with duct tape. They took the victims in Kehoe's vehicle to the Illinois bayou; there they taped rocks onto them and threw them into the bayou. The bodies were discovered in Lake Darnelle near Russellville, Arkansas in late June 1996.

Kehoe and Lee returned to Spokane with the stolen property around January 14, 1996. Kehoe traveled to several states to sell the Mueller property at gun shows,

and he and Lee were apprehended by law enforcement in 1997 after some of Mueller's guns had been traced to Kehoe.

Lee, Kehoe, and several others were indicted on December 12, 1997. On January 5, 1998, Lee appeared in court for arraignment and was ordered detained until trial. A superceding indictment was filed, charging Lee with racketeering in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a), and use of a firearm in violation of 18 U.S.C. § 922. The indictment alleged that the APR was a RICO enterprise designed to start a revolution in the United States in order to create a new nation and that members of the APR, including Lee, established and financed the APR through robbery, kidnapping, murder, and dealing in stolen property. Prior to trial the conspiracy to commit robbery and firearm charges were dismissed.

The government filed notices of intent to seek the death penalty against both Lee and Kehoe under 18 U.S.C. § 3593(a). The amended death penalty notice for Lee identified several aggravating factors that the government intended to prove in support of death sentences for each of the three murder counts he faced. These aggravating factors included: expectation of receiving something of pecuniary value, 18 U.S.C. § 3592(c)(8); substantial planning and premeditation to cause the death of the victim, id. § 3592(c)(9); intentional killing of more than one person in a single criminal episode, id. § 3592(c)(16); and risk of future dangerousness. The government also listed the additional aggravating factor of a vulnerable victim in Sarah Powell's murder. Id. § 3592(c)(11).

Lee and the government filed several pretrial motions. After a hearing in November 1998, the district court granted a motion under Fed. R. Crim. P. 16(d) to restrict Lee's personal access to discovery materials in the interest of protecting

witnesses. In February 1999, the district court granted the government's request to delay the mandatory disclosure of witness names under 18 U.S.C. § 3432. The district court also denied several motions by Lee and Kehoe. Prior to trial all the defendants other than Lee and Kehoe pled guilty. Lee and Kehoe were jointly tried.

At trial, the government presented numerous witnesses and circumstantial physical evidence to prove Lee's participation in the murders of the Mueller family. Kehoe's mother, Gloria, testified that Lee had confessed the murders to her. The district court also admitted statements made by Kehoe to his mother, in which he confessed the Mueller murders and other criminal activities in great detail. Gloria testified that Kehoe told her Lee had participated in the murder of the adults, but would have no part in the killing of Sarah Powell so Kehoe had done it alone. The district court also admitted hearsay statements made by Kehoe to his brother, Cheyne, confessing the three murders. The government called a number of other witnesses. They included Sean Haines, a man Lee had attempted to recruit into the APR, James and Dalvine Wanker, both of whom knew Lee when he lived in Washington, and David Lynch, who helped Lee recruit other people into the APR. Haines testified that Lee was involved in Kehoe's white supremacist movement and that he had tried to recruit him into the APR several times. The Wankers corroborated Gloria Kehoe's testimony by recounting that Lee had told them about a trip down south in which some people had messed with him and he had done something violent to take care of them. They also testified that Lee had made statements to them about his white supremacist beliefs. Lynch stated that he had helped Lee recruit Jon Cox into the APR and that Lee had told him about taking part in militia type activities.

The circumstantial evidence adduced at trial included physical evidence connecting Kehoe's vehicle to the crime scene, evidence that Lee and Kehoe were in Arkansas at the time of the murders, evidence connecting Lee and Kehoe to police raid clothing worn at the time of the murders, their possession of Mueller property

immediately after the murders, Lee's fingerprint found on Mueller belongings stored with APR property, and hair similar to Lee's found on a raid cap which Kehoe told Cheyne was used during the Mueller murders.

Following a two month trial, on May 4, 1999 a jury convicted Lee and Kehoe of the capital murder counts, racketeering, and conspiracy to commit racketeering. The defendants were sentenced after separate penalty phases before the same jury. Kehoe's penalty phase proceeded first, and he was sentenced to life without release. After Kehoe's sentencing, the U.S. Attorney tried to withdraw the death notice in Lee's case, but the Department of Justice denied her request. United States v. Lee, 274 F.3d 485, 488-89 (8th Cir. 2001). Prior to Lee's penalty phase, the parties agreed on instructions permitting the jury to consider Lee's past criminal history and behavior. The jury returned a death verdict against Lee on May 14, 1999. A few days later on May 19, Lee moved for correction of the sentence and a new sentencing phase of the trial. The district court granted the motion, and the government appealed. We reversed and reinstated the death sentence. Id. at 497. Now before the court is Lee's direct appeal from the judgment of conviction and sentence.

## II.

On his direct appeal Lee raises a number of issues. He argues that his Sixth Amendment rights to confrontation and effective assistance of counsel were violated. Other issues include limitations put on his discovery rights, the sufficiency of the evidence and the indictment, the denial of his severance motion, certain jury instructions, and the constitutionality of the Federal Death Penalty Act.

## A.

Lee argues that his Sixth Amendment confrontation rights were violated by the admission of hearsay statements made by nontestifying codefendant Kehoe to Gloria and Cheyne Kehoe. Lee contends that the statements are testimonial and therefore

inadmissible under the confrontation clause. Crawford v. Washington, 124 S. Ct. 1354 (Mar. 8, 2004). We review denials of confrontation clause objections de novo, United States v. Beal, 279 F.3d 567, 570 (8th Cir. 2002). If any evidence was admitted in violation of Lee's confrontation rights, we consider whether the error was harmless beyond a reasonable doubt. Lilly v. Virginia, 527 U.S. 116, 140 (1999).

The confrontation clause of the Sixth Amendment gives an accused the fundamental right to confront the witnesses against him. Crawford, 124 S. Ct. at 1359. The central function of this right is to protect individuals from the use of ex parte statements as evidence against them in a criminal trial. Id. at 1363. The confrontation clause bars the admission of testimonial statements made by witnesses outside of court, unless the witnesses are unavailable and the defendant had a previous opportunity to cross examine them. Id. at 1369. While the Supreme Court has not attempted to give a complete listing of what may be included within the category of testimonial statements, in Crawford it specified that plea allocutions, grand jury testimony, prior trial testimony, preliminary hearing testimony, and police interrogations are testimonial statements. Id. at 1374. In contrast to these examples, casual statements to an acquaintance are not testimonial. Id. at 1364. Nor are statements to a coconspirator or business records testimonial. Id. at 1367; United States v. Reyes, 362 F.3d 536, 541 (8th Cir. 2004).

Lee argues that the statements made to Cheyne Kehoe are testimonial because they were detailed, confessional, and made after the events to a cooperating individual. He contends that these statements are not admissible as statements made to a coconspirator because Cheyne did not join the conspiracy and the statements were not made in furtherance of it. See Fed. R. Evid. 801(d)(2)(E).

A statement is not hearsay and is admissible as a statement made to a coconspirator if it advances the objectives of the conspiracy and does not merely

-6-

inform the listener of the declarant's activities. United States v. Snider, 720 F.2d 985, 992 (8th Cir. 1983). Coconspirator statements made outside the scope of the conspiracy may be admissible, id., and statements made to recruit new members are in furtherance of the conspiracy. United States v. Ortiz-Martinez, 1 F.3d 662, 674 (8th Cir. 1993).

Lee asserts that the statements to Cheyne were not coconspirator statements because Kehoe made them only to inform his brother about his activities. He cites Snider in support, a case in which hearsay statements did not come within the coconspirator category because they had been made to the testifying witness to impress her and she was not involved in the marijuana enterprise. 720 F.2d at 992. Here, Kehoe made the statements to Cheyne while they were traveling around the country together, selling guns and ammunition stolen from the Muellers at the time of their murders. Kehoe confessed the murders to Cheyne in great detail, admitted that he had killed Sarah Powell on his own, and showed Cheyne the police raid gear he and Lee had used in gaining access to the Mueller house. Kehoe shared this information with Cheyne to explain why he needed to dispose of the arms quickly, to enlist Cheyne's assistance in selling them, and to recruit Cheyne into the APR. After hearing this information, Cheyne continued to participate willingly in the sale of the stolen property. We conclude that Kehoe's comments to Cheyne about the Mueller murders were not testimonial in nature. They are admissible because they were coconspirator statements made in furtherance of criminal activity, namely the selling of stolen property. See Crawford, 124 S. Ct. at 1367; Reyes, 362 F.3d at 541.

Lee argues that Kehoe's statements to Gloria are testimonial because they were confessional, detailed, and made to an individual who allegedly later became an agent of the government. Kehoe's statements to Gloria do not fall into any of the categories of testimonial statements identified in Crawford, 124 S. Ct. at 1374. The circumstances surrounding them do not raise the same confrontation concerns as the

introduction of witness statements previously made in court proceedings or during police interrogations. Kehoe's statements to his mother do not implicate the core concerns of the confrontation clause. He confessed to his mother after she asked him about Mueller property she saw in his possession while visiting him. This took place over a year before Gloria had any contact with law enforcement agents. Kehoe's statements were more like casual remarks to an acquaintance than formal testimonial statements made to law enforcement. See id. at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); see also 18 U.S.C. § 1001(a)(2) (prohibiting the making of false statements to federal officers). Kehoe's statements to Gloria during her visit were not testimonial and are not barred under Crawford.

Lee contends that nontestimonial hearsay statements are only admissible after Crawford if they fall within one of the firmly rooted hearsay exceptions to the confrontation clause and that Kehoe's statements to Gloria do not fall within any of these exceptions. He argues that the indicia of reliability test under Ohio v. Roberts, 448 U.S. 56, 66 (1980), is no longer part of confrontation clause analysis. The government counters that nontestimonial hearsay statements are admissible if they fall within one of the hearsay exceptions in the Federal Rules of Evidence or have sufficient indicia of reliability. It also maintains that substantial additional evidence was adduced at trial, making harmless any error in the admission of Kehoe's statements to Gloria.

After reviewing the record, we conclude that any error in the admission of Kehoe's statements to Gloria was harmless beyond a reasonable doubt. There was sufficient evidence at trial to support Lee's conviction, even without Gloria's testimony about what Kehoe had told her. The evidence admitted at trial included Lee's confession to Gloria that he was involved in the Mueller murders; he does not challenge the admission of this testimony on appeal because it was properly admitted

as an admission by a party opponent. See Fed. R. Evid. 801(d)(2)(A). The government also produced several other witnesses (including the Wankers, Cheyne, Haines, and Lynch) who testified to Lee's involvement in either the Mueller murders or the APR organization. Considerable circumstantial evidence of Lee's participation in the Mueller murders was introduced, including Lee's fingerprints found on Mueller property, hair similar to Lee's in a raid cap used during the murders, and Lee's possession of Mueller property immediately after the murders. Kehoe's statements to Gloria merely corroborated the large amount of evidence presented against Lee at trial. Any error in the admission of these statements was harmless beyond a reasonable doubt.

B.

Lee argues that the district court abused its discretion by failing to give an accomplice instruction requiring the jury to consider whether the testimony of Gloria and Cheyne Kehoe was sufficiently corroborated. He maintains that failure to give the accomplice instruction violated his confrontation rights and that the testimony of the Kehoes was uncorroborated. He asserts that corroboration was required under Arkansas substantive law, and that it was for the jury in its deliberations to determine the sufficiency of the prosecution's evidence. The denial of a request for a jury instruction is reviewed for abuse of discretion, United States v. Gary, 341 F.3d 829, 834 (8th Cir. 2003), and reversal is only appropriate if the error affected the defendant's substantial rights. United States v. Wright, 246 F.3d 1123, 1128 (8th Cir. 2001).

Special instructions for accomplice testimony are only required "where the witness's testimony concerning the defendant's participation in the offense is uncorroborated." United States v. Schoenfeld, 867 F.2d 1059, 1061 (8th Cir. 1989). In cases where there is corroborating evidence, further instruction to the jury to treat accomplice testimony with caution is not needed. United States v. Kehoe, 310 F.3d 579, 593 (8th Cir. 2002). Here, evidence at trial corroborated the testimony of Gloria

and Cheyne. While Lee argues that less evidence was introduced against him than against Kehoe, witness testimony and other circumstantial evidence was introduced to corroborate the testimony of the Kehoes and to establish that the murders actually took place and that he participated in them. United States v. Opdahl, 610 F.2d 490, 492-93 (8th Cir. 1979). Because the testimony was corroborated, the district court did not abuse its discretion in refusing to give Lee's proposed jury instruction.

## C.

Lee argues that the district court abused its discretion by denying his motion to sever his trial from Kehoe's. He contends that he was prejudiced by the joint trial because the district court admitted hearsay statements that were not independently admissible against him and there were spillover effects from evidence which implicated Kehoe but not him. The denial of a motion to sever is reviewed for abuse of discretion and will only be reversed if definite prejudice is shown. United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996).

Joint trials of defendants indicted together are generally conducted because they promote efficiency and the interests of justice, Zafiro v. United States, 506 U.S. 534, 538 (1993), but Rule 14 permits severance if "it appears that a defendant or the government is prejudiced by the joinder." Fed. R. Crim. P. 14. Severance is appropriate "only if there is a serious risk that joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. It is not an abuse of discretion to deny a severance motion when not every joined defendant has participated in every offense charged, Delpit, 94 F.3d at 1143-44, when evidence which is admissible only against some defendants may be damaging to others, id., or when there is varying strength in the evidence against each defendant. United States v. Dierling, 131 F.3d 722, 734 (8th Cir. 1997).

-10-

Lee contends that his case falls within two categories identified in Zafiro as potentially problematic. One is where evidence is admitted that the jury can only consider against one defendant, and the other is where the defendants have markedly different degrees of culpability. Zafiro, 506 U.S. at 539. Zafiro only noted that these are situations where the risk of prejudice is high, however, and the Court did not indicate that such cases automatically require severance. Id. Moreover, the Court pointed out that these problems may be remedied by less drastic measures than severance. Id.

Lee argues that evidence was admitted at trial which was not independently admissible against him because the hearsay statements offered by Gloria and Cheyne Kehoe violated his confrontation clause rights. As we have already discussed, any error in the admission of these statements was harmless so this argument cannot prevail. Lee also maintains that it was improper not to sever the trial because there were prejudicial spillover effects, citing United States v. Baker, 98 F.3d 330, 335 (8th Cir. 1996). In contrast to Lee's case, the defendant alleging prejudice in Baker had not been charged with conspiracy. Here, Lee cannot show similar prejudice because he was charged with participating in the same conspiracy as Kehoe, and the fact that he was not charged with all the same predicate acts does not require severance. See Dierling, 131 F.3d at 734. The district court did not abuse its discretion in denying Lee's severance motion because the hearsay evidence was independently admitted against him and there were no prejudicial spillover effects from the evidence.

D.

Lee argues that the evidence presented at trial was insufficient to prove that he was involved either in the charged criminal enterprise or in the conspiracy. He contends that the government did not prove that he intentionally joined the conspiracy or that the Mueller murders were motivated by white supremacist beliefs. We review de novo the sufficiency of the evidence to support a jury verdict. United States v. Campa-Fabela, 210 F.3d 837, 839 (8th Cir. 2000). The facts are reviewed in the light

-11-

most favorable to the verdict, all reasonable inferences are accepted, id., and reversal is only appropriate if no reasonable jury could have found the defendant guilty. United States v. Stroh, 176 F.3d 439, 440 (8th Cir. 1999).

To establish a conspiracy, the government must prove: (1) that there was a conspiracy; (2) that the defendants knew of the conspiracy; and (3) that the defendants intentionally joined the conspiracy. United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003). Direct or circumstantial evidence may be used to prove the conspiracy's existence. Id. Lee argues that there was no evidence that he joined the conspiracy, but this argument is not supported by the record. Several witnesses testified to the fact that Kehoe led a white supremacist organization and intended to build an Aryan nation in Idaho. Haines identified Lee as a member of this organization and testified that Lee tried to recruit him into it. Further, Lynch stated that he helped Lee recruit Cox into the APR and talked with Lee about his militia type activities. This testimony alone is sufficient to show that there was a conspiracy, that Lee knew about it, and that Lee chose to join it.

Three elements must be proven to show that a RICO enterprise existed: (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering. United States v. Kragness, 830 F.2d. 842, 855 (8th Cir. 1987). Lee argues that the government did not prove that he was part of the RICO enterprise charged in the indictment because there was no evidence that he shared the common purpose of a white supremacy movement until he was jailed in 1998 after the Mueller killings. The testimony of the Wankers indicated, however, that Lee had white supremacist beliefs prior to his pretrial detention, and Haines' testimony demonstrated that Lee belonged to Kehoe's white supremacist movement and engaged in activities to further it.

-12-

There was sufficient evidence for a reasonable jury to find that both a conspiracy and a RICO enterprise existed and that Lee intentionally joined and participated in each.

E.

Lee argues that the Federal Death Penalty Act, 18 U.S.C. § 3593 (FDPA), is unconstitutional because it allows for evidence inadmissible during the criminal trial to be admitted during the penalty phase unless its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. We rejected this argument earlier in this case, see Lee, 274 F.3d at 494-95, but Lee urges that the issue be revisited in light of Ring v. Arizona, 536 U.S. 584 (2002). Lee also argues that the FDPA is unconstitutional under Ring because it creates a new common law criminal offense. The government responds that Lee's evidentiary issue is barred under the law of the case doctrine and that the plain error rule applies to both issues since Lee did not preserve them in the district court. We review challenges to a criminal statute's constitutionality de novo. United States v. Koons, 300 F.3d 985, 990 (8th Cir. 2002).

Lee asserts that the FDPA's relaxed admission standard during the penalty phase allows for introduction of less reliable evidence in violation of his due process and confrontation rights, relying on a post Ring decision, United States v. Fell, 217 F. Supp. 2d 469 (D. Vt. 2002), since reversed on appeal. See United States v. Fell, 360 F.3d 135, 143-46 (2d Cir. 2004). We agree with the Second Circuit that the FDPA standard does not impair the reliability of the evidence admissible during the penalty phase. Id. at 145-46. Rather, the admission of more rather than less evidence during the penalty phase increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense. Id. at 143. We agree that the FDPA standard

provides a level of protection that ensures that defendants receive a fundamentally fair trial and that it is not unconstitutional.[3]  Id. at 145.

Lee also asserts that the FDPA is unconstitutional after Ring because the Court exceeded its constitutional powers in that case by in effect creating a new common law criminal offense with elements never considered or enacted into law by Congress. The statute involved in Ring required aggravating factors for the death penalty to be imposed, and the Supreme Court considered them to be functional equivalents of the elements of an offense.  Ring, 536 U.S. at 609.  Aggravating factors must therefore be found beyond a reasonable doubt before the death penalty may be imposed.  Id. Lee argues that by holding statutory aggravating factors to be the functional equivalents of elements of the offense, the Supreme Court added elements to the offense, thus creating a new common law crime.  He contends that since the FDPA also requires proof of aggravating factors it must be interpreted after Ring to create new common law offenses.  We reject Lee's argument because in Ring the Court did not add elements to the statutory offense.  Rather it acknowledged that for a maximum penalty to be imposed, the legislature had required findings of aggravating factors in addition to findings on the elements of the offense.  Id.

F.

Lee argues that the district court erred because it recognized a potential juror's bias in favor of the death penalty, but it failed to strike that juror and prejudiced Lee by forcing him to use a preemptory strike to eliminate the juror.  We review district court voir dire decisions for abuse of discretion.  United States v. Nelson, 347 F.3d 701, 706 (8th Cir. 2003).  It is well settled that a defendant is not deprived of any

_____

[3]Lee also has no entitlement to relitigate an issue previously decided in an earlier stage of this case unless he "introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice." United States v. Bartsh, 69 F.3d 864, 866 (8th Cir. 1995).  Lee has presented no new evidence and has not shown that our earlier decision was erroneous.

rights if a district court fails to remove a juror for cause, the defendant elects to cure the alleged error by exercising a preemptory challenge, and the defendant is then convicted by an unbiased jury. United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000); Nelson, 347 F.3d at 710; United States v. Paul, 217 F.3d 989, 1004 (8th Cir. 2000). Because Lee cured any error, he cannot prevail on this claim.

G.

Lee raises several issues on appeal that were not preserved at trial, and we review each of these issues for plain error. Fed. R. Crim. P. 52(b). Under plain error review, there must be an error that is plain which affects substantial rights. United States v. Cotton, 535 U.S. 625, 631 (2002). Reversal is only appropriate if the error affects the outcome of the case. Id. at 632. We address each issue in turn.

1.

Lee argues that his confrontation rights were violated when the district court allowed his counsel to stipulate to the receipt of evidence at his penalty phase which the jury had already heard and seen during Kehoe's penalty phase.[4] He contends that he retains confrontation rights during the penalty phase, see Ring, 536 U.S. at 584, and that personal confrontation rights cannot be waived by counsel. Lee concedes that the standard of review is plain error since he raised no objection at trial. He asserts nevertheless that the stipulation infringed on his personal confrontation rights so he need not show prejudice. The government does not contest that Lee has confrontation rights during the penalty phase, but argues that he has not shown plain error and points out that the same jury had already been exposed to all of this evidence.

---

[4]The stipulated evidence included victim vulnerability testimony and crime scene evidence. Three witnesses testified as to victim vulnerability: a cousin of Sarah Powell; a friend, who identified some of Sarah's clothing; and a man who had met Sarah at several gun shows and described her as the ideal child. The crime scene evidence consisted of flex cuffs, duct tape, rocks removed from the Muellers' bodies, and graphic photographs of the bodies.

A waiver of constitutional rights is effective if it is clear and intentional. Brookhart v. Janis, 384 U.S. 1, 4 (1966). A defendant may waive his confrontation rights by pleading guilty, Boykin v. Alabama, 395 U.S. 238, 243 (1969), by stipulating to the admission of evidence, United States v. Carlson, 547 F.2d 1346, 1357-58 (8th Cir. 1976), by voluntary absence at trial, Taylor v. United States, 414 U.S. 17, 18-19 (1973), and by his own misconduct or disruptive actions, Illinois v. Allen, 397 U.S. 337, 342-43 (1970). Counsel may waive an accused's constitutional rights for tactical reasons when the circumstances are not exceptional. Loggins v. Frey, 786 F.2d 364, 368 (8th Cir. 1986). Circumstances are exceptional when a defendant has not personally waived nor acquiesced in an attempted waiver by counsel. Id.

Lee argues that under Clemmons v. Delo, 124 F.3d 944, 956 (8th Cir. 1997), his counsel could not waive his confrontation rights by stipulating to the evidence presented at Kehoe's penalty phase. He says confrontation rights are personal, fundamental, and cannot be waived by counsel. In Clemmons, the court held that the defendant's confrontation rights were violated by his lawyer's consent to the admission of an accuser's deposition because the defendant had been unaware of the taking of the deposition, did not know that the evidence would be admitted until trial, and never consented to its admission. Id. at 952, 955-56. This case differs from Clemmons, however, for Lee knew about the stipulation before his penalty phase started and had the opportunity to object to his counsel's waiver of his confrontation rights before the court.

This case is more like Loggins v. Frey, 786 F.2d at 368, where we recognized a valid waiver of a defendant's confrontation rights. In Loggins, we held that the defense counsel's stipulation at trial to the admission of the victim's hearsay testimony did not violate the defendant's confrontation rights because he had acquiesced in the stipulation and had personally waived his confrontation rights by not objecting at

trial. Id. The defendant there was aware of the testimony and had an opportunity to object to its admission, just as here. Lee was aware of the stipulation prior to the penalty phase and waived his confrontation rights when he did not object to the stipulation in court. Because Lee waived his confrontation rights, he cannot succeed on this claim.

2.

Lee argues that the district court erred in failing to dismiss the indictment against him because it did not allege every element of a capital offense by including the aggravating factors necessary to impose a death sentence. He contends that the indictment did not include the mens rea or statutory aggravating factors required. See 18 U.S.C. §§ 3591(a)(2), 3592(c). The government maintains that the indictment charged Lee with three murders in aid of racketeering and that these murders were committed "with the purpose of causing the death of" the victims. It also asserts that the indictment included two statutory aggravating factors: murder in expectation of the receipt of something of pecuniary gain and intentional killing of more than one person in a single criminal episode. 18 U.S.C. §§ 3592(c)(8), (16). Lee admits that he first raised this issue on appeal and concedes that the plain error standard applies.

The Fifth and Sixth Amendments require that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones v. United States, 526 U.S. 227, 243 n. 6 (1999). If the constitutional sufficiency of the indictment is first raised on appeal, then plain error applies. Cotton, 535 U.S. at 631.

Lee relies on a recently vacated decision of our court, United States v. Allen, 357 F.3d 745, 747 (8th Cir. 2004), reh'g en banc granted May 11, 2004, for the proposition that an indictment violates the Fifth Amendment if it does not allege all the facts necessary for imposition of the punishment, including in a capital case at least one statutory aggravating factor under § 3592(c). In Allen, the defendant

-17-

preserved this issue for appeal by raising the unconstitutionality of the indictment both before trial and again at trial, so the harmless error standard applied. Id. Here, because Lee first raised the issue on appeal a different standard applies and it includes "a separate fairness-integrity inquiry." Id. at 753 n.6; Cotton, 535 U.S. at 631. Lee must show that the indictment was defective and that it seriously affected the fairness and integrity of the judicial proceedings. Cotton, 535 U.S. at 631; Allen, 357 F.3d at 753 n.6.

Even if the indictment was defective, Lee cannot show plain error because it did not seriously affect the fairness and integrity of the judicial proceedings. Cotton, 535 U.S. at 633. The proceedings were not tainted because Lee received an amended death penalty notice on October 16, 1998. This case thus does not raise any of the notice problems generally associated with a defective indictment. Furthermore, the petit jury's findings confirmed the soundness of the judicial proceedings and rendered harmless any conceivable error in the charging decision. Id.; see also United States v. Mechanik, 475 U.S. 66 (1986). The petit jury in Lee's case found that the government had proved the statutory aggravating factors of murder for pecuniary gain and intentional killing of more than one person in a single criminal episode. The jury also found that the nonstatutory aggravating factor of future dangerousness had been proved. Based on these findings, the jury unanimously voted to sentence Lee to death, and this indicates that initiation of the death penalty prosecution was not unfounded. Lee has not shown plain error.

3.

Lee argues that the district court violated his due process rights and 18 U.S.C. § 3432 by holding a hearing without his counsel having received notice of it or being present and by ruling that the prosecution did not have to provide defense counsel the

names of witnesses three days before trial.[5] The government maintains that the names of the witnesses did not have to be disclosed because disclosure would have greatly endangered their lives.

Section 3432 provides that a person charged with a capital offense "shall at least three entire days before commencement of trial be furnished with a copy of . . . the witnesses to be produced on the trial for proving the indictment."  18 U.S.C. § 3432.  The statute provides for an exception "if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." Id.  The disclosure of witnesses in a capital case is generally required under § 3432, and failure to provide a witness list is reversible error unless the exception applies. Hall v. United States, 410 F.2d 653, 660 (4th Cir. 1969).  A defendant can waive his rights by failing to object to the list, Brown v. United States, 375 F.2d 310, 317 (D.C. Cir. 1966), or by failing to object at the commencement of the testimony of an undisclosed witness. Hickory v. United States, 151 U.S. 303, 307-08 (1894). Lee did not object either to the list or to the testimony of any of the undisclosed witnesses when they were called at trial and thus waived his disclosure and due process rights. Lee did not preserve this issue by objecting so the standard of review on his appeal is plain error.  See Fed. R. Crim. P. 52(b).

Lee contends that he can show plain error because the disclosure of Dee and James Wanker as witnesses less than 48 hours before their appearance prevented adequate trial preparation by his counsel.  As evidence of inadequate preparation, Lee points to the fact that his counsel did not impeach these witnesses even though their

_____

[5]On February 19, 1999, the prosecution wrote a letter to the district court requesting that seven witness names not be disclosed to the defense because it would greatly endanger their lives.  Three of these witnesses, David Lynch and James and Dee Wanker, later testified at trial about Lee's involvement in the murders and APR. The Wankers were disclosed as witnesses less than 48 hours before their appearance at trial.

credibility could have been questioned because they had received relocation money from the government. The decision of Lee's counsel not to impeach these witnesses could well have been strategic, however, for there was reason not to bring up the Wankers' relocation. The government says that they were moved because of previous retaliation against witnesses by white supremacist groups. Even though it has not said that it facilitated the Wankers' relocation due to a fear of retaliation by Lee, his counsel may have wanted to keep any evidence of this type from the jury. Lee has not shown plain error.

4.

Lee argues that his discovery rights were violated when the district court improperly excused the government from complying with § 3432 by not requiring the government to disclose the names of witnesses before trial. He also asserts that his discovery rights were violated by the court's order prohibiting counsel from allowing him to view or retain discovery materials and from disclosing witness names to him. He contends that the order was an impermissible intrusion into the attorney client relationship and effectively denied him counsel. Lee's counsel was present at the hearing on the government's motion to restrict discovery but did not raise an objection, and we review this issue for plain error.

Under Fed. R. Crim. P. 16(d), a district court may for good cause limit a defendant's discovery based on an ex parte written statement. As a general rule counsel cannot be prevented from assisting the accused during a critical stage of the proceeding or be banned from all communications with the defendant for any period of time. See Geders v. United States, 425 U.S. 80, 91 (1976). Here, the district court found good cause for limiting Lee's access to discovery materials based on the government's argument that Lee was a danger to potential witnesses. Its order was not a blanket proscription against Lee communicating with counsel, however. The order prevented Lee from accessing discovery documents and the names of witnesses, but it permitted him to be informed about all other matters and to discuss them with

counsel. It did not violate § 3432, which only requires disclosure of witness and juror names to the defense but not to the defendant personally. The district court's order limiting discovery was not plain error because it did not impermissibly limit Lee's communications with his attorneys.

5.

Lee argues that his death sentence was arbitrarily imposed in violation of 18 U.S.C. § 3595(c)(1), the Fifth Amendment, and the Eighth Amendment because Kehoe, the more culpable defendant, did not receive the death penalty. The government counters that Kehoe was not the more culpable defendant, for Lee had several serious prior offenses and had demonstrated a violent, unrepentant nature by attacking one of his jailors. Appellate courts "shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(1). This claim of Lee's is reviewed for plain error because it was not raised earlier, and § 3595(c) does not create an exception to plain error review. Jones, 527 U.S. at 388-89.

Lee argues that § 3595(c)(1) was violated because he received a harsher punishment than Kehoe, who he claims is the more culpable defendant. He cites no case indicating that imposition of the death penalty on one defendant but not the other violates § 3595(c)(1). We decided in Paul that the death penalty was not arbitrarily imposed on a capital defendant despite the jury's refusal to consider the accomplice's sentence of life imprisonment as a mitigating factor. Paul, 217 F.3d at 999-1000. Nor does the FDPA require proportional review of sentences. Allen, 247 F.3d at 760. Lee has not provided support for his claim that the death penalty was arbitrarily imposed on him.

H.

Lee argues that his Sixth Amendment right to assistance of counsel was violated by his trial attorneys because lead defense attorney, Jack Lassiter, had a

conflict of interest. According to Lee, Lassiter was conflicted by his desire to help the career advancement of a member of the defense team, Karen Coleman, and he gave preference to her interests over those of Lee. Lassiter thus refrained from disclosing to him or cocounsel that Coleman was planning to join the U.S. Attorney's office, even though he knew of her pending move several weeks in advance. He allowed Coleman to continue to work on Lee's case and to appear at hearings as Lee's sole representative up until her departure from the firm, even though she had accepted employment with the U.S. Attorney and had received security clearance. Lee only inadvertently learned of Coleman's departure when she left Lassiter's firm three weeks before trial.

When Kehoe's counsel learned about Coleman's departure around the same time, he raised the matter before the district court out of concern for the appearance of impropriety. The district court held a hearing at which Lee contends Lassiter testified adversely to his interests by supporting Coleman's employment interest. Lee also argues that Lassiter failed to join Kehoe's motion to disqualify the U.S. Attorney's office because of his conflict. At the hearing Lassiter testified that clients had not been informed of Coleman's departure until after her background check had been completed and explained that he had "full confidence in her integrity." He also stated that Coleman continued to organize witness statement files to prepare for trial after she had formally accepted the job in the prosecutor's office but that he did not feel that he needed to tell her to stop. He admitted that he had not discussed the situation with Lee, explaining that he had not had the opportunity. Another member of the defense team, Cathleen Compton, testified that she had grave concerns about the situation and that her concerns were shared by Lee. Lee contends that Lassiter testified contrary to his best interests, that the district court should have held a colloquy with Lee about the conflict, and that his interests should have been protected by the appointment of new counsel for the duration of the hearing.

Lee further asserts that his right to effective assistance of counsel was violated because his trial attorneys failed to make several pretrial objections, including objections to restrictions on his ability to review discovery materials and to oppose the government's motion to delay the disclosure of witness names under 18 U.S.C. § 3234. He claims that the failure of his counsel to object to these discovery restrictions impeded their ability to consult effectively with him and to prepare for trial. Lee points out that his trial counsel did not object at trial to the testimony of previously undisclosed witnesses or attempt to impeach their testimony even though valid grounds for impeachment existed. Finally, Lee argues that his trial counsel waived his confrontation rights by stipulating to highly prejudicial evidence during the penalty phase without consulting him.

A defendant's claims of ineffective assistance of counsel are generally not cognizable on direct appeal. United States v. Triplett, 104 F.3d 1074, 1083 (8th Cir. 1997). They may be heard only if a miscarriage of justice would otherwise result, see United States v. Wood, 270 F.3d 728, 730 (8th Cir. 2001), or if the district court has developed a record on the issues. See Triplett, 104 F.3d at 1083. Here, Lee argues that his ineffective assistance claims should be reviewed upon direct appeal because all the relevant facts are available, but he does not dispute that the district court has not developed a record on the issues and he does not argue that a miscarriage of justice would result if the claims were not reviewed now. Lee's ineffective assistance claims are premature and should be raised collaterally through a § 2255 motion in district court.

### III.

In sum, we conclude that Lee's confrontation rights were not violated by the testimony of Gloria and Cheyne Kehoe or by the district court's jury instructions, that the district court did not abuse its discretion by denying Lee's motion to sever, and that there was sufficient evidence presented at trial to support his conviction. We

conclude further that the district court did not err by allowing Lee's counsel to stipulate to evidence at his penalty phase, by not dismissing the indictment, by holding an ex parte hearing under § 3432, or by limiting Lee's access to discovery. We find that the death penalty was not arbitrarily imposed in this case and that the Federal Death Penalty Act is constitutional.

Accordingly, we affirm Lee's conviction and sentence but dismiss without prejudice his ineffective assistance claims as premature.

_____