Young, C.J.
(dissenting). The question posed by this case is: Can an out-of-court statement selectively used by a defendant in support of his principal defense serve *565 as a predicate for a Confrontation Clause claim after the prosecutor has used the statement to impeach the defendant’s expert? Defendant and the majority answer this question in the affirmative. I believe that the answer is unquestionably no and therefore dissent.
In this case, defendant’s trial counsel declined to call as a witness the author of the out-of-court statement — a psychiatric evaluation — because he believed that the author would be a bad witness for the defense and would undermine the proffered insanity defense. This defense trial strategy proved partially successful; the jury found defendant guilty but mentally ill. On appeal, defendant now attempts to transform this conscious trial strategy into an “appellate parachute” by raising an ineffective assistance of counsel claim premised on an alleged Confrontation Clause violation because the author of the out-of-court statement, which defendant’s own expert relied on and referred to, did not testify at defendant’s trial. Although our jurisprudence abhors sanctioning such appellate parachutes,[1] the majority here blesses this artful appellate strategy. I cannot.
These uncontested facts notwithstanding, United States Supreme Court caselaw is equally inconvenient to the majority’s conclusion. Apart from the appellate parachute problem, the psychiatric evaluation that defendant claims violated his Confrontation Clause rights was not a testimonial out-of-court statement and therefore did not even implicate the rights guaranteed by the Confrontation Clause. The United States Supreme Court has made this perfectly clear: in Melendez-Diaz v Massachusetts, the Court expressly stated that “medical reports created for treatment purposes . . . would not be testimonial” statements within the meaning of *566 the Sixth Amendment’s Confrontation Clause.[2] Missed by the majority in this case is the fact that none of the nine justices who served on the Melendez-Diaz Court would have included medical reports created for treatment purposes in the definition of testimonial statements.[3] The psychiatric evaluation at issue in this case falls within that category of evidence considered to be nontestimonial because it was created to evaluate and treat defendant during his two-week hospitalization in a psychiatric intensive care unit.
Moreover, even if the psychiatric evaluation at issue were to be considered testimonial within the meaning of the Confrontation Clause, the prosecutor’s purpose in referring to Dr. Shahid’s evaluation was to impeach defendant’s expert, a purpose that falls outside the purview of the Confrontation Clause.[4] Because neither the facts nor the law supports the majority’s decision in this case, I would affirm the decision of the Court of Appeals, albeit for different reasons than the Court of Appeals articulated, and affirm defendant’s convictions.
I. FACTS AND PROCEDURAL HISTORY
This case involves defendant Charles Fackelman’s *567 emergency hospitalization at a Toledo, Ohio, psychiatric intensive care unit, beginning on March 29, 2007. Specifically, we are concerned with a psychiatric evaluation prepared by defendant’s treating physician, Dr. Agha Shahid, during his hospitalization.
Defendant suffered from severe depression, including a suicide attempt, following the death of his teenage son in June 2006. Defendant’s depression became particularly acute in the days leading up to his March 2007 hospitalization because it was the beginning of the baseball season for his son’s high school team. While watching the team’s game on March 27, 2007, defendant “began to cry” and “wave[d] . . . off” parents of his son’s teammates from talking to him. Instead, he jogged to his car, drove home, and locked himself in his room, which was something he did “occasionally when [he] didn’t want to be seen.”
The next day, defendant drove from his home in northern Ohio to confront the Monroe County man he believed responsible for his son’s death, Randy Krell.[5] Defendant testified that he did not remember the incident. According to Krell, defendant arrived at Krell’s home wielding a pistol.[6] He pointed the gun at Krell’s chest and told Krell, “We’re gonna talk.” Defendant then directed Krell toward *568 Krell’s garage, all the while continuing to tell Krell that “we’re gonna talk and end this all in about a minute.” When defendant loaded the chamber of his pistol for firing, Krell ran across the street into his neighbor’s house and asked his neighbor to call 911, which the neighbor did. Before the neighbor completed his 911 call, the neighbor heard “a loud crash” and his “entire doorframe came flying in and landed in ... the entranceway....” Still brandishing the weapon, defendant knocked the telephone out of the neighbor’s hand and looked through the house for Krell, spending about 3V2 or 4 minutes inside the house before leaving.
Defendant returned to his car without again confronting Krell.[7] Later that evening, defendant arrived at his mother’s house in Toledo, walked over to a heat register, and placed the gun in the air duct. He also called his brother and asked him to “come and get it and get rid of it.”[8] After he left his mother’s house, defendant’s family and friends became worried for his safety, and they began searching for him. Eventually, a family friend found defendant at a gas station in Bowling Green, Ohio. At the request of the family’s attorney, the friend drove defendant to Flower Hospital in Toledo. Just outside the hospital, and apparently while the family attorney was finalizing defendant’s admission into the hospital, police arrested defendant. Defendant was searched but then released from police custody for his hospitalization.
After spending the night of March 28-29, 2007, at Rescue Crisis Mental Health Services in Toledo, defen *569 dant was transferred back to Flower Hospital to be admitted into the psychiatric intensive care unit. Defendant was placed under the care and supervision of Dr. Shahid.
After interviewing and observing defendant, Dr. Shahid prepared a three-page “Psychiatric Evaluation” on Flower Hospital letterhead, which Dr. Shahid signed and dated March 31, 2007. The evaluation described defendant’s history of present illness, past psychiatric history, medical history, family history, social history, mental status examination, strengths and limitations, estimated length of hospitalization, diagnosis, and plan of treatment. Dr. Shahid concluded in this evaluation that defendant suffered from “[m]ajor depression,” that it was a “single episode,” and that it was “severe without psychosis.”
Defendant was charged with first-degree home invasion,[9] two counts of felonious assault with a dangerous weapon,[10] and felony-firearm.[11] Defendant raised an insanity defense at his three-day jury trial. Defendant testified that he did not know how he ended up at Krell’s house, that he did not remember chasing Krell, and that he did not remember knocking down the door of the neighbor’s house. Furthermore, he testified that he did not remember going to his mother’s house, hiding his gun, or talking to Dr. Shahid at Flower Hospital.
While presenting his case-in-chief, defendant called an expert witness, Dr. Zubin Mistry, who testified that defendant was legally insane at the time of the crime.[12] *570 The prosecutor called a rebuttal expert witness, Dr. Jennifer Balay, who testified that defendant was legally sane. Both experts testified that they relied in part on Dr. Shahid’s evaluation in forming their opinions about defendant’s mental state. However, neither party called Dr. Shahid as a witness, nor did either party formally introduce his evaluation into evidence.
The jury found defendant guilty but mentally ill of all the charged offenses. On appeal, the Court of Appeals remanded this case to the trial court for a Ginther hearing on defendant’s claim of ineffective assistance of counsel.[13] At the hearing, defendant’s trial counsel testified that he did not object to the prosecutor’s use of Dr. Shahid’s evaluation because he thought the prosecutor was using the evaluation solely to impeach defendant’s expert. Moreover, he explained, it did not occur to him that the use of the evaluation could violate the Confrontation Clause.[14] More important, he also testified that he “didn’t want to call attention to” the evaluation and that he feared Dr. Shahid “would have been a bad witness if everything in that report would have come out. . . .”[15] The trial court concluded that *571 defendant did not receive constitutionally ineffective assistance of counsel and affirmed defendant’s convictions. The Court of Appeals affirmed on the grounds that, although counsel had erred by allowing the prosecutor to use extrajudicial testimonial statements for the truth of the matter asserted, the error did not prejudice defendant. We granted defendant’s application for leave to appeal.
II. STANDARD OF REVIEW
Defendant claims that he received ineffective assistance of counsel after counsel failed to object to the use of Dr. Shahid’s psychiatric evaluation. “Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant’s constitutional right to effective assistance of counsel.”[16] We review a trial court’s findings of fact for clear error, while we review any underlying questions of constitutional law de novo.[17]
III. ANALYSIS
A. INEFFECTIVE ASSISTANCE OF COUNSEL
This appeal is presented to us as a claim of ineffective assistance of counsel. Defendant claims that his trial *572 counsel was constitutionally deficient for failing to object when the prosecutor questioned two expert witnesses about Dr. Shahid’s psychiatric evaluation and referred to the evaluation in his closing statement.
The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right “to have the Assistance of Counsel for his defence.”[18] “[T]he [United States Supreme] Court has recognized that ‘the right to counsel is the right to the effective assistance of counsel.’ ”[19]
The United States Supreme Court has articulated two requirements for a defendant to establish that he is entitled to a new trial on the basis of ineffective assistance of counsel:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[20]
Defendant now claims that his trial counsel erred by allowing the prosecutor to question his expert and the *573 prosecutor’s rebuttal expert about Dr. Shahid’s evaluation and to refer to Dr. Shahid’s evaluation in his closing argument. This is an absurd proposition because it was defendant who first raised the issue of his insanity and who first opened the door to questioning about Dr. Shahid’s evaluation because his defense expert selectively relied on the evaluation during the defense’s case-in-chief and because defendant considered, but decided against, calling Dr. Shahid to the witness stand. The majority does not explain why it would allow the defendant to rely on Dr. Shahid’s evaluation without his being called as a witness, but preclude the prosecutor from using that same evaluation for impeachment and in rebuttal without calling Dr. Shahid as a witness.
Today’s majority decision, thus, says in effect that a prosecutor is constitutionally required to call a particular witness — the author of an out-of-court statement — on the basis of the defense’s selective use of that statement and conscious strategic decision not to call the author as a witness. The result of the majority’s decision will be to promote trial and appellate gamesmanship.
The majority’s decision flies in the face of the fact that a criminal defendant can waive his confrontation rights[21] and “[cjounsel may waive an accused’s constitutional rights for tactical reasons when the circumstances are not exceptional.”[22] Counsel can also waive confrontation rights when he “purposefully and explic *574 itly opens the door on a particular (and otherwise inadmissible) line of questioning” because “such conduct operates as a limited waiver allowing the government to introduce further evidence on that same topic.”[23]
Under the circumstances of this case, it is no surprise that defendant’s trial counsel failed to object to the prosecutor’s use of Dr. Shahid’s evaluation to rebut defendant’s insanity defense. I would hold that defendant affirmatively waived his right to confront Dr. Shahid because he chose, as a matter of trial strategy, not to call him as a witness.[24] Therefore, he cannot now claim that the prosecutor’s failure to call Dr. Shahid as a witness on an issue for which the prosecutor bore no burden of proof violated his confrontation rights.[25]
Notwithstanding the issue of waiver, defendant claims that the prosecutor’s use of Dr. Shahid’s evaluation violated his Sixth Amendment right to confront the witnesses against him and the evidentiary rules regarding the introduction of hearsay. I will discuss defendant’s legal claims seriatim.
B. CONFRONTATION CLAUSE
The Sixth Amendment to the United States Constitution provides, in relevant part, “In all criminal pros *575 ecutions, the accused shall enjoy the right... to be confronted with the witnesses against him. . ..” This right has been incorporated to the states under the Fourteenth Amendment.[26]
The Confrontation Clause seeks to prevent “the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.”[27] In its seminal Confrontation Clause decision, Crawford v Washington, the Supreme Court concluded that “the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.”[28] While previous cases interpreting the Confrontation Clause emphasized the truth-seeking function of the right of confrontation,[29] the Crawford Court reoriented Confrontation Clause jurisprudence toward confrontation’s procedural safeguards to ensure that “reliability be assessed in a particular manner: by testing in the crucible of cross-examination.”[30]
*576 The majority helpfully summarizes this conclusion in articulating what it styles an “alternative analysis”[31] for determining whether a Confrontation Clause violation has occurred: “(1) Does the person in controversy comprise a ‘witness against’ the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to ‘confront’ that witness under the Confrontation Clause?”[32] Far from being an alternative analysis, these two questions simply assert uncontested constitutional first principles. Thus, the majority’s alternative analysis does not answer the difficult and fact-intensive inquiry required to review this case.
As the majority’s test illustrates, and as the Crawford Court held, the Confrontation Clause “applies to ‘witnesses’ against the accused — in other words, those who ‘bear testimony.’ ”[33] Crawford emphasized the qualitative distinction between testimonial statements and nontestimonial statements for purposes of applying the Confrontation Clause:
Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law .... Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.[34]
Therefore, any case that applies the Confrontation Clause must determine, as a threshold matter, whether the statement at issue is testimonial.
*577 1. WHAT CONSTITUTES “TESTIMONY”?

“[Miedical reports created for treatment purposes ... would not be testimonial under our decision today.”

—Melendez-Diaz v Massachusetts (2009)[35]
“Testimony” is “ ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ”[36] The Court explained that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not,” and concluded that “[t]he constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.”[37]
Although it did not delineate the scope of testimonial statements, the Crawford Court acknowledged that “[v]arious formulations of this core class of ‘testimonial’ statements exist,”[38] and instead of choosing one, it “[left] for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ”[39] In reviewing Crawford and its progeny, it becomes clear that the Court considers two related factors above all others when deciding whether an extrajudicial statement is testimonial, and therefore within the parameters of the Confrontation Clause: the formality of the statement within a criminal investigation or prosecution and the purpose of the *578 statement.[40] Formal statements created as part of the investigative or judicial process — such as statements that are “quite plainly affidavits” — are testimonial.[41] Similarly, statements that are made for the express purpose of investigating and prosecuting crimes — such as a statement “the sole purpose of [which] was to provide ‘prima facie evidence of the composition, quality, and the net weight’ of the analyzed substance” — are likewise testimonial.[42] Contrarily, statements made for some other primary purpose — such as responses to interrogations in order “to enable police assistance to meet an ongoing emergency”[43] or “medical reports created for treatment purposes”[44] — are not testimonial. *579 This last example, specifically referenced in Melendez-Diaz, is particularly relevant to the instant case.
In deconstructing this reference in Melendez-Diaz, the majority claims that this dissent fails to account for the final phrase of footnote 2 — “ ‘under our decision today’ ”[45] — and it argues that, instead, “the circumstances under which a medical report created for treatment purposes could be considered testimonial was simply left for another day.”[46] In fact, the Melendez-Diaz majority was responding to Justice Kennedy’s concern that the core holding of Melendez-Diaz would create unintended consequences.[47] Moreover, while the context of the Melendez-Diaz majority’s decision supports the interpretation that this opinion attaches to footnote 2, all the caselaw applying Crawford and its progeny attaches great significance to the broader proposition that the footnote applies: a statement’s primary purpose is accorded great weight in the determination whether the statement is testimonial in nature.[48] In the end, while the facts of this case were not squarely before the Court in Melendez-Diaz, the Melendez-Diaz majority’s statement that “medical reports created for treat *580 ment purposes . . . would not be testimonial under our decision today” is highly instructive regarding how to apply Confrontation Clause principles to the facts of the instant case.
There are also a number of instructive state supreme court cases that illustrate the Melendez-Diaz Court’s recognition that “medical reports created for treatment purposes” are not testimonial.[49] For instance, in People v Cage, the California Supreme Court held that a victim’s statement to his doctor at a hospital was not testimonial because it was made for the purpose of “immediate acute treatment”[50] and not to bear,, testimony against the defendant. Alternatively, in Hartsfield v Commonwealth, the Kentucky Supreme Court held that a statement made to a sexual assault nurse examiner was testimonial because the purpose of the questioning was to “elicitO evidence of past offenses with an eye toward future criminal prosecution,” making the nurse “an active participant in the formal criminal investigation.”[51]
The Ohio Supreme Court’s decision in State v Stahl perhaps most fully explained a court’s inquiry into the purpose of a statement.[52] It held that, although a forensic nurse working in an emergency room “serves a prosecutorial function by collecting evidence,” that function is “at best secondary to the . . . primary motivation, the care of [the unit’s] patients.”[53] The court went on to explain:
*581 [The defendant] asserts that [the nurse’s] taking of evidence, which included swabbing for DNA with the help of ultraviolet light, taking pictures of [the victim’s] mouth, and taking a napkin that [the victim] used after the incident, demonstrates the ... unit’s prosecutorial purpose and renders [the victim’s] statements testimonial. Emergency rooms routinely perform these procedures, and a witness in this situation could reasonably believe that the ... unit’s medical examination, including the incident history statement, serves primarily a medical function.[54]
In distinguishing an emergency room nurse’s “primary” and “secondary” functions, the Stahl court answered the majority’s concern that “[i]t is utterly unclear how a court would apply the ‘primary purpose’ test outside the Davis context to a case in which no emergency [requiring immediate police assistance] is alleged” and its questions regarding “what alternative ‘purposes’ would be considered, and how would the resolution of which of these is ‘primary’ bear in any meaningful way on the principles inherent in the Confrontation Clause[.]”[55]
These cases and others reiterate the United States Supreme Court’s acknowledgment in Melendez-Diaz that statements made for the purposes of diagnosing and treating medical emergencies are not testimonial, while recognizing statements that carry an investigative purpose and that turn medical professionals into “active participant[s] in the formal criminal investigation” can create testimonial statements, even if they are created by medical professionals.[56] The majority has not *582 followed this line of analysis. Instead, it substitutes an inquiry into the mere foreseeability of a statement’s use at trial for an inquiry into the primary purpose for which the statement was created. The majority’s analysis is simply contrary to the mandates of Davis, Melendez-Diaz, and most recently Michigan v Bryant.[57] Thus, the majority of this Court continues to misapply the Confrontation Clause caselaw of the United States Supreme Court.[58]
2. APPLICATION
In light of the foregoing analysis of Confrontation Clause jurisprudence, the statement at issue in this case was not testimonial because it was neither formal nor created for the primary purpose of investigating or prosecuting crimes.[59] As stated, the declarant, Dr. Sha *583 hid, treated defendant during his hospitalization in Flower Hospital’s psychiatric intensive care unit for an acute psychiatric episode.[60] In rendering emergency psychiatric treatment to a patient who had already attempted suicide once before and who continued to exhibit severe depression, Dr. Shahid created a detailed evaluation that outlined defendant’s medical condition and determined the most appropriate course of emergency treatment.
Because the context and contents of the entire evaluation are essential to determining whether it is testimonial, the Appendix to this opinion contains the evaluation with minor redactions.[61] In order to treat *584 defendant, Dr. Shahid had to understand his patient’s medical and psychiatric history, particularly in a situation in which his patient had previously attempted to commit suicide, had been admitted on an emergency basis in a severely depressed state, and continued to express suicidal ideation.
Thus, Dr. Shahid interviewed defendant regarding every aspect of his illness, in particular, its origin in the death of defendant’s son and the continuing effect of that death on defendant’s mental state. This required Dr. Shahid to ask defendant, not only about his son’s death generally, but also, more specifically, what he remembered about the incident with Krell. Dr. Shahid determined that defendant “feels helpless, hopeless and worthless” but is “[o]riented to time, place and person.” In short, the evaluation documented defendant’s mental and physical state at the time of the evaluation — his mood, affect, temperature, pulse, respiration, and blood pressure — and provided a diagnosis and plan of treatment for the periods during and after defendant’s hospitalization.
Important for our analysis is the fact that Dr. Shahid’s evaluation did not end with his diagnosis of defendant; rather, it followed that diagnosis with a plan of treatment. After diagnosing defendant’s depression as “severe without psychosis,” Dr. Shahid concluded that defendant should “[c]ontinue Prozac” and “add Seroquel,” a drug used to “help patient with sleep, agitation and his complaint that he cannot shut his mind.” Dr. Shahid also determined that defendant should continue with psychotherapy after his discharge.
All these facts lead inexorably to the conclusion that Dr. Shahid’s primary purpose in undertaking and documenting defendant’s psychiatric evaluation was to provide medical care and treatment, not to serve as “an *585 active participant in the formal criminal investigation” or prosecution.[62] The evaluation was, therefore, created not in anticipation of litigation, but in anticipation of continued treatment.
The majority emphasizes that Dr. Shahid’s evaluation noted that “the Monroe County sheriff want[ed] to be called when [defendant] is discharged to home” and that defendant “ha[d] legal charges against him through the State of Michigan 38th Judicial Circuit . . . .” The fact that Dr. Shahid was aware of the pending criminal charges against defendant does not alter Dr. Shahid’s primary purpose in preparing his evaluation: to render emergency psychiatric treatment to defendant. Moreover, there was no indication that his treatment was handled any differently because of the pending charges, and the acknowledgment of the charges constitutes a legitimate part of the patient’s history that is a customary part of psychiatric evaluations. Indeed, it would be passing strange for the evaluating psychiatrist to fail to note the conditions under which the patient was referred to the psychiatric emergency room in the first instance. This is essentially a passing reference in an evaluation that is otherwise entirely devoted to recording and treating defendant’s psychiatric emergency, including an emphasis on defendant’s suicidal ideation. Significantly, and undercutting the majority’s foreseeability analysis, there is no evidence, other than being aware that defendant had been arrested for assaulting Krell, that Dr. Shahid had any other contact with the police or the prosecutor in this case.
The majority itself quotes the evaluation’s introductory statement that defendant “ ‘had suicidal *586 thoughts.’ ”[63] Dr. Shahid emphasized the suicidal ideation later in his evaluation, repeating that defendant had attempted suicide by drug overdose and stating that defendant continued to exhibit suicidal ideation— defendant “stated that he thinks about suicide ‘all the time.’ ” Moreover, Dr. Shahid explained that defendant “was transferred to the psychiatric intensive care unit for his safety since the patient was thinking intensely about suicide, and he just does not want to live anymore.”
Also, the majority distinguishes the psychiatric treatment that defendant received from other medical treatment and suggests that this distinction is determinative in confrontation cases.[64] This distinction confuses the purpose of documenting a psychiatric evaluation with its potential effect on future proceedings. Not only has the United States Supreme Court “never addressed” this issue,[65] at least one state court that considered it after Crawford (albeit in dicta) made no distinction between psychiatric treatment and other medical treatment.[66] There is simply no principled distinction for applying the Confrontation Clause differently when analyzing psychiatric medical treatment than when analyzing medical treatment for “physical” illnesses— particularly because courts must examine the purpose for which an out-of-court medical statement was created. As stated, Dr. Shahid explained in his evaluation that defendant was admitted to the psychiatric intensive care unit “for his safety” because he “was thinking *587 intensely about suicide . . . Thus, the purpose of Dr. Shahid’s emergency care and treatment of defendant was no different than an emergency room physician’s treatment of a person with life-threatening physical injuries: the immediate stabilization of the patient.
The majority’s determination that Dr. Shahid’s evaluation was testimonial runs contrary to the United States Supreme Court’s Confrontation Clause caselaw on the matter. The Court stated in Melendez-Diaz that “medical reports created for treatment purposes” are not testimonial, a position to which the entire Court subscribed.[67] In holding to the contrary, the majority places great weight on the fact that, because Dr. Shahid was aware of and acknowledged the pendency of charges against defendant, an “ ‘ “objective [psychiatrist] would reasonably [be led] to believe that [his statements] would be available for use at a later trial.” ’ ”[68] Notwithstanding the fact that the standard that the majority quotes is not the standard of law that is binding on our decision today,[69] the majority *588 fails to give appropriate credence to Dr. Shahid’s efforts to diagnose defendant’s medical problem and to create a treatment plan, efforts that were clearly articulated in the evaluation. The evaluation itself acknowledged that defendant would be hospitalized for “10-14 days” and would be receiving both prescription medications and psychotherapy during and after his hospitalization. In reading Dr. Shahid’s entire evaluation, it is hard to conclude, as the majority does, that Dr. Shahid was primarily concerned with anything other than defendant’s mental health.
As stated, the Melendez-Diaz Court affirmed the non-testimonial nature of medical reports created for treatment purposes. Melendez-Diaz emphasized that reviewing courts must examine the primary purpose of the statement’s creation when determining whether it runs afoul of the Confrontation Clause. The majority has not provided any indication that Dr. Shahid did anything other than treat defendant for his severe depression.
3. IMPEACHMENT
Even if, contrary to my conclusion above, Dr. Shahid’s evaluation was testimonial in nature, the Con *589 frontation Clause “does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.”[70] Accordingly, notwithstanding the majority’s suggestion that we should not engage in what it terms “mental gymnastics” in determining whether the prosecutor’s use of Dr. Shahid’s evaluation was to prove the truth of the matter asserted,[71] that is just the type of analysis that the United States Supreme Court’s Confrontation Clause jurisprudence requires.
In order to meet his burden of proving by a preponderance of the evidence that he was legally insane at the time of the crimes,[72] defendant presented the testimony of Dr. Mistry. On direct examination, Dr. Mistry admitted that he reviewed “records from Flower Hospital, Dr. Shahid’s records . . . .” Dr. Mistry’s admission that he reviewed Dr. Shahid’s records opened the door to inquiry about how Dr. Shahid’s records influenced Dr. Mistry’s expert opinion, including any points of disagreement between his opinion and the information contained in Dr. Shahid’s evaluation.
Far from “[going] well beyond the scope of the direct examination,” the prosecutor appropriately sought to undermine the opinion proffered by defendant’s expert, that the defendant was legally insane, by using Dr. Shahid’s evaluation to impeach that opinion.[73] And Dr. Shahid’s evaluation was a powerful tool for impeachment because Dr. Shahid concluded that defendant did not suffer from psychosis when he evaluated him *590 shortly after the crimes were committed.[74] Having read Dr. Shahid’s evaluation and records in reaching his own opinion, Dr. Mistry was properly compelled by the prosecutor’s impeachment to explain how he came to an entirely different conclusion than the treating physician concerning the defendant’s mental status at the time of the crimes.
The majority’s extensive quotations from the trial transcripts indicate nothing to the contrary: Dr. Mistry confirmed that he reviewed Dr. Shahid’s evaluation, including Dr. Shahid’s diagnosis of defendant, and indicated that he disagreed with that diagnosis because of his review of the entire record, including information that Dr. Shahid did not have at his disposal. And yet, notwithstanding these extensive quotations, the majority does not provide sufficient context to understand the nature of the prosecutor’s cross-examination.[75] That *591 context shows that the prosecutor initially sought to use factual information contained in Dr. Shahid’s evaluation that conflicted with Dr. Mistry’s own observations and proves the impeachment purpose of questioning Dr. Mistry about the evaluation.
One of the points of conflict between Dr. Mistry’s testimony and Dr. Shahid’s evaluation was the extent to which defendant remembered what occurred on the afternoon of March 28, 2007. As part of his inquiry into defendant’s mental state, Dr. Mistry interviewed defendant, who explained that “[h]e had no recollection of the events of that time[,] only what he heard from other people.” It was in challenging this point that the prosecutor first discussed the substance of Dr. Shahid’s evaluation. After confirming that Dr. Mistry had read Dr. Shahid’s evaluation, the prosecutor asked Dr. Mistry whether he was aware that defendant had explained to Dr. Shahid “that on the day that this happened he wanted [Krell] to feel my pain” and that defendant stated “that he remembers stopping his car and seeing that person who [defendant] believes was responsible for his son’s death, and stated that that person took off in the street and, quote: I followed him across the street.”
The prosecutor sought to impeach Dr. Mistry’s credibility as an expert on the basis of these conflicting statements by defendant. This is evident from the prosecutor’s suggestion that defendant had “a motivation not to tell the full truth [to Dr. Mistry] about his memory” because Dr. Mistry could help defendant’s case “if he reaches a certain conclusion . . . .” While Dr. *592 Mistry denied that defendant had lied to him regarding his lack of memory, he admitted that part of his diagnosis required him “to develop an opinion as to whether [defendant] is being sincere or whether [he’s] misconstruing things or lying in order to paint a picture to you of [himself] in a certain way.”
It was only after this point that the prosecutor cross-examined Dr. Mistry regarding Dr. Shahid’s diagnosis. Thus, after raising the factual differences between Dr. Shahid’s psychiatric evaluation session with defendant at the hospital and Dr. Mistry’s later pretrial interview with defendant, the prosecutor sought to link those factual differences to the different diagnoses themselves. Indeed, the prosecutor asked Dr. Mistry whether he could “point to anything specific in [Dr. Shahid’s evaluation] where you . . . can say he made a mistake,” and Dr. Mistry could not. Rather, Dr. Mistry “[didn’t] disagree with Dr. Shahid on his observations,” only “as to the diagnosis.”
In short, the prosecutor’s use of Dr. Shahid’s evaluation during his cross-examination of Dr. Mistry was for the purpose of impeaching Dr. Mistry’s expert opinion, not to prove the truth of Dr. Shahid’s evaluation.
However, the prosecutor did not just refer to Dr. Shahid’s evaluation during his cross-examination of Dr. Mistry. The prosecutor also referred to the evaluation during his direct examination of his rebuttal expert witness, Dr. Balay. As with his cross-examination of Dr. Mistry, the prosecutor highlighted the differences between Dr. Shahid’s psychiatric session with defendant and Dr. Balay’s psychiatric interview of defendant. Dr. Balay explained that defendant “claimed to basically have no memory of any of the events” that occurred on the afternoon of March 28, 2007, even though she acknowledged that defendant had described to Dr. Sha *593 hid some memories from that afternoon. Dr. Balay then explained to the prosecutor that defendant could either be suppressing the memories or “just be lying,” but that she “[had] no way of knowing one way or the other.” In the end, Dr. Balay indicated that she agreed with Dr. Shahid’s conclusion that defendant was not psychotic. She also stated that she disagreed with Dr. Mistry’s conclusion and explained her reasons for doing so. In particular, she determined that defendant had acted methodically in pursuit of his stated motive — that he “was furious at this man who he believed had caused the death of his son” — and that such methodical behavior is “the most relevant” factor in determining whether a person is able to conform his conduct to the requirements of the law. As with the cross-examination of Dr. Mistry, the purpose of the direct examination of Dr. Balay was to impeach Dr. Mistry’s credibility and not necessarily to assert that Dr. Shahid’s diagnosis was true.
Finally, the prosecutor referred to Dr. Shahid’s evaluation during his closing argument, explaining that “it’s real important to look at what Dr. Shahid had to say, even though he didn’t testify here before you” and emphasizing that Dr. Shahid “reached the conclusion at the end [of] his examination that Mr. Fackelman was depressed, he had severe depression, but that there was no psychosis involved.” However, this does not change the fact that during defendant’s case-in-chief, the prosecutor used Dr. Shahid’s evaluation for a proper impeachment purpose rather than to prove the truth of the matter asserted. Moreover, the trial court explained that “lawyers’ statements and arguments are not evidence” and that “[e]vidence includes only the sworn testimony of witnesses, the exhibits which were admitted into evidence, and anything else I told you to *594 consider as evidence.”[76] Because Dr. Shahid’s evaluation meets none of these criteria, and because “jurors are presumed to follow their instructions,”[77] I cannot conclude that the prosecutor’s closing argument prejudiced defendant. The trial court’s cautionary instruction properly insulated the jury from any inappropriate use of Dr. Shahid’s evaluation during closing argument.
Because the majority seriously errs in applying United States Supreme Court Confrontation Clause precedent to the instant case, I respectfully dissent and would hold that Dr. Shahid’s medical evaluation was not testimonial and, therefore, not subject to the Confrontation Clause. Moreover, even if Dr. Shahid’s evaluation were testimonial, it was primarily used not to prove the truth of the matter asserted, but to impeach defendant’s expert witness. Accordingly, defendant’s trial counsel did not err by failing to raise a Confrontation Clause objection to Dr. Shahid’s evaluation.
C. HEARSAY
Even if Dr. Shahid’s evaluation is not subject to the Confrontation Clause, it is still subject to the Michigan Rules of Evidence, including our evidentiary rules regarding hearsay. However, because counsel is not ineffective for failing to raise futile objections,[78] we must determine whether any objection to Dr. Shahid’s evaluation on evidentiary grounds would have been successful.
As a prehminary matter, it is undisputed that Dr. Shahid’s evaluation, among other facts and data, provided a basis for the testimony of the two expert witnesses in *595 this case.[79] Furthermore, MRE 703 provides, “The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence.”[80] However, even though such facts and data “shall be in evidence,” they might be subject to our evidentiary rules regarding hearsay.[81]
“Hearsay is not admissible except as provided by” our evidentiary rules,[82] which define “hearsay” as “a *596 statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”[83] It is uncontested that Dr. Shahid’s evaluation is “a statement, other than the one made by the declarant while testifying at the trial or hearing. . . .”[84]
Assuming for the sake of argument that the prosecutor’s purpose for referring to Dr. Shahid’s evaluation in closing was, in substantial part, to use it to prove the truth of the matter asserted,[85] MRE 803(6), the business records exception, nevertheless, allows introduction of “[a] memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge . ...” As a diagnosis of defendant’s psychiatric condition, Dr. Shahid’s evaluation falls squarely within this exception and therefore was admissible into evidence.
*597 The majority correctly observes that MRE 803(6) also requires authentication by “the testimony of the custodian or other qualified witness . . . .”[86] However, the majority entirely overlooks the fact that defendant was required to admit Dr. Shahid’s evaluation into evidence in the first instance, since defendant’s expert admitted that Dr. Shahid’s evaluation comprised, in significant part, the “facts and data” on which he based his opinion.[87] Moreover, defendant does not dispute the authenticity of Dr. Shahid’s evaluation, even on appeal. Since his own expert first relied on the evaluation, defendant can hardly (certainly not legitimately) claim that when it was used in rebuttal, the evaluation became inauthentic. Thus, this case does not even present a situation in which defendant simply failed to object to the authenticity of Dr. Shahid’s evaluation; rather, defendant affirmatively endorsed its authenticity because his own expert relied on it in forming his opinion, which was the foundation of the insanity defense. Under such circumstances, defendant cannot receive relief on the basis of authentication error.[88]
*598 D. TRIAL STRATEGY
Even if I were to conclude that trial counsel erred by failing to raise a Confrontation Clause or hearsay objection to Dr. Shahid’s evaluation (which I do not), before granting defendant relief, the Court must also determine whether that failure constituted an error “so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.”[89] In undertaking this inquiry, Strickland made clear that a defense counsel’s trial strategy must be given deference because “[e]ven the best criminal defense attorneys would not defend a particular client in the same way.”[90] The Court explained:
Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[91]
Instead, reviewing courts must “evaluate the conduct from counsel’s perspective at the time,” and defendants must “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”[92]
*599 To begin with, defendant’s trial strategy was to raise the defense of insanity rather than contest the factual elements of the charged crimes. Although the prosecutor must prove the factual elements of the charged crimes beyond a reasonable doubt, the defendant bears the burden of proving insanity by a preponderance of the evidence.[93] In this case, defendant’s trial counsel stated at the Ginther hearing that he did not object when the prosecutor first cross-examined defendant’s expert witness about Dr. Shahid’s evaluation because he “didn’t want to call attention to” it, which would have undermined the insanity defense. Moreover, counsel also stated that he “had a discussion as to whether or not to even present Dr. Shahid” but explained that “the concern was that he would have been a bad witness if everything in that [evaluation] would have come out, and it would have hurt rather than helped” defendant’s insanity defense.[94]
Defense counsel thus had a dilemma: his own expert had relied on portions of Dr. Shahid’s evaluation to establish his own opinion that defendant was legally insane, but the entire evaluation was harmful to the insanity defense. According to the defense expert, he agreed with all of Dr. Shahid’s evaluation except his conclusion that the defendant had not suffered a break with reality when he committed the crimes. Accordingly, counsel, after apparent consultation with defen *600 dant, made a conscious decision to downplay Dr. Shahid’s evaluation. Given that the evaluation contained information detrimental to his client’s defense— particularly the conclusion that defendant was not suffering from psychosis and was thus legally sane — I cannot conclude that this trial strategy was objectively unreasonable. To the contrary, defendant’s strategy may have represented the best strategy possible: defendant was allowed to rely on favorable portions of Dr. Shahid’s statement as the basis for his insanity defense while avoiding having Dr. Shahid take the stand to explain his finding of “no psychosis,” which could have completely undercut defendant’s proffered defense. Indeed, this defense trial strategy proved partially successful; the jury found defendant guilty but mentally ill. The majority ought to explain why this strategy should not be given the deference Strickland requires.
Defendant now claims that the failure to call Dr. Shahid to the witness stand violated his rights under the Confrontation Clause, and the majority treats this failure as if it were an omission. It has been made clear that this was not an omission, but a conscious strategy that defendant’s trial counsel employed.[95] When properly considered as a conscious decision to avoid calling as a witness an expert that counsel reasonably thought would have been “a bad witness,” defendant’s claim of error seems to be the very danger that the Strickland Court warned against: allowing defendant to “second- *601 guess counsel’s assistance after conviction or adverse sentence . .. .”[96] The majority compounds this problem by “examining counsel’s defense after it has proved unsuccessful, [and] concluding] that a particular act or omission of counsel was unreasonable.”[97] Because I do not believe that this Court should reward defendants for pursuing a reasonable trial strategy then using it as an appellate parachute, I also dissent on this alternative basis from the majority’s conclusion that defense counsel rendered objectively unreasonable assistance of counsel.[98]
The majority explains that, because “insanity is an affirmative defense with respect to which a defendant carries the burden of proof,”[99] defendant had no choice but to open the door to questioning about his mental state through expert testimony. Moreover, the majority explains that “[n]o such [expert] witness could have neglected altogether to mention the existence of the report of the only person who actually interviewed defendant in the immediate wake of his conduct.”[100] Precisely! These observations prove just how completely the majority fails to understand basic impeachment, and reinforce just how appropriately strategic was defense counsel’s decision not to call Dr. Shahid as a witness. It would appear that the majority believes that *602 no impeachment of the defense expert could have occurred under these circumstances unless the prosecutor called Dr. Shahid as his own witness. If the Confrontation Clause can properly be read to require this result, then Crawford will seem a tiny shift compared to the seismic destruction that this new majority rule will require.
There is no question that Dr. Shahid’s evaluation contained statements that any expert would have had to take into account when forming an opinion regarding defendant’s mental state. As explained previously, the evaluation also revealed inconsistencies concerning what defendant remembered about the afternoon in question, inconsistencies that any expert witness would have had to resolve. Yet precisely because the defense expert was silent about these inconsistencies, the prosecutor cross-examined him regarding his selective use of the evaluation. The majority would raise this strategic silence to a constitutional level and insulate the expert from such cross-examination. I would not hamstring the impeachment of an expert witness in such a way.
IV CONCLUSION
Because Dr. Shahid’s evaluation was initially used by the defense as a part of its legitimate trial strategy to establish its insanity defense, the prosecutor’s use of that same evaluation in rebuttal cannot constitute a Confrontation Clause violation. The majority’s conclusion to the contrary rewards a clever appellate parachute strategy.
Secondarily, Dr. Shahid’s evaluation was a “medical report[] created for treatment purposes .. . .”[101] United *603 States Supreme Court precedent could not be clearer that the Confrontation Clause did not prohibit introduction of the evaluation into evidence. The majority’s failure to apply the Supreme Court’s Confrontation Clause doctrine can only cause further confusion in an already confusing area of law. Accordingly, I would hold that the prosecutor’s use of Dr. Shahid’s evaluation did not violate defendant’s constitutional right to confront the witnesses against him. Furthermore, the evaluation was admissible under the business records hearsay exception, and defense counsel’s failure to object to the prosecutor’s use of the evaluation did not render his assistance constitutionally ineffective, nor was his trial strategy to downplay Dr. Shahid’s evaluation objectively unreasonable. Accordingly, I would affirm the judgment of the Court of Appeals and affirm defendant’s convictions.
Zahra, J., concurred with Young, C.J.
APPENDIX
47-year-old Caucasian married male was referred by Rescue Crisis Mental Health Services with an emergency application indicating that the patient’s son was killed eight months ago in a traffic accident, and the patient drove to the man’s home with a gun who patient felt was responsible for the death of his son. Patient has severe depression and had suicidal thoughts to overdose. The emergency application also indicated that the Monroe County sheriff wants to be called when the patient is discharged to home.
HISTORY OF PRESENT ILLNESS: Patient stated that he had been feeling down and depressed since June of 2006 after his 17-year-old son was killed in an auto accident. Patient stated that his son was riding *604 with other individuals in the car and somebody chased his son’s car, and as a result there was an accident and his son was killed in that accident. Patient complains of feeling sad, blue, down and depressed. Complains of poor sleep, poor appetite, poor concentration and low energy. Feels worthless and has feelings of guilt. Patient states he just feels empty inside. Has feelings of hopelessness. Patient stated that he thinks about suicide “all the time.” At the present time, patient does not have any active plan of killing himself. Patient stated that after his son was killed, he took an overdose of pills that he had over-the-counter. The patient stated at that time, he informed his primary care physician and was started on Prozac 20 mg daily that was later on increased to 40 mg daily. Patient stated that prior to this admission, he went to the person who he believes was responsible for his son’s death and, “I wanted him to feel my pain.” Patient states that during the legal trial and otherwise, the person who patient believes was responsible for the death of his son has not shown any remorse, and this makes patient very angry. The patient stated that he remembers stopping his car and seeing that person who the patient believes was responsible for his son’s death and stated that that person took off in the street and, “I followed him across the street.” Patient states, “I do not remember driving to Michigan and driving to his house. I do not remember what happened, and the only thing I remember is that I saw a terrified look on that man’s face, and at that time I felt I just woke up and started apologizing to that man.” The patient stated that he went back to his car and drove away and stated that he stopped at his mother’s house, and he believes that he left the gun that he had with him at his mother’s house. Patient stated that he had a handgun for years and years that he kept in a dressing drawer in his bedroom. The patient states he *605 does not remember taking the gun out of the drawer when he went to that person’s house in Michigan. When I asked him about if there were bullets in the gun, patient states he does not remember, but he thought that he had bullets in his pocket and stated that he believes that he flushed the bullets down the toilet or he believes that he threw his bullets away.
Patient stated that since the death of his son on June 5, 2006, “My whole life has been torn apart,” then patient went on to say that on Tuesday he went to his son’s school, Whitmer High School, where his friends were playing baseball and states that he watched the baseball game, but all the time when he was watching the baseball he missed his son and stated the school team won, and when he left the playground he was just in tears and he was feeling sad, and then he believes that while going to the game, brought a lot of memories back to him and his feeling of loss got more intensified.
PAST PSYCHIATRIC HISTORY: Denies previous psychiatric treatment. As mentioned above, patient did take an overdose after the death of his son, then he was started on Prozac by his primary care physician.
MEDICAL HISTORY: [Redacted ]
FAMILY HISTORY: [Redacted.]
SOCIAL HISTORY: [Redacted.] Denies abusing drugs or alcohol, except since the death of his son he had been drinking more heavily “to numb myself.” Patient described his spiritual life that he used to believe in God but “not anymore. If there is a God, why did he give me my son and then took it away. I used to pray but not anymore.” Patient stated that he goes to church to support his wife.
MENTAL STATUS EXAMINATION: Patient looks of his stated age, not in any acute physical distress. *606 Mood is dysphoric, and affect is depressed. Temperature 97.7. Pulse 85. Respirations 16. Blood pressure 126/79 on admission. Today, patient’s temperature is 97.2. Pulse 81. Respirations 18. Blood pressure 141/95. Patient feels helpless, hopeless and worthless. The patient has suicidal thoughts but denies any active plans of hurting himself. Initially, patient was admitted to the adult closed unit but was transferred to the psychiatric intensive care unit for his safety since the patient was thinking intensely about suicide, and he just does not want to live anymore. Patient feels hopeless, helpless and worthless. Has marked feelings of anger and guilt. Oriented to time, place and person. Recent and remote memory is intact, and intelligence is normal. Speech is relevant and goal-oriented. During most part of this interview, patient was crying and sobbing. He is denying auditory or visual hallucinations but states that after the death of his son, “I was smelling things and I felt things crawling under my skin, but not anymore.” Attention and concentration are extremely poor. Patient states, “My mind is going all the time. I cannot shut up my mind. I am thinking about my son all the time.” At the present time, patient is denying any homicidal thoughts or plans. I specifically asked the patient if he wants to kill the person that he feels is responsible for the death of his son, and patient stated, “I just feel sorry for him. I am not thinking of killing him.” Patient has suicidal thoughts but does not have any active plan of hurting himself. Patient has been admitted to the psychiatric intensive care unit for his safety.
STRENGTHS AND LIMITATIONS: Patient has supportive family and is employed, which is a strength. Loss of son is the limitation.
ESTIMATED LENGTH OF STAY: 10-14 days.
*607 DIAGNOSIS:
Axis I: Major depression, single episode, severe without psychosis.
Axis II: Deferred.
Axis III: Hyperlipidemia.
Axis IV: Severe (loss of son).
Axis V: GAF 20.
PLAN:
Continue Prozac, and I will add Seroquel. Off-label use of Seroquel was discussed with the patient. Seroquel is added to help patient with sleep, agitation and his complaint that he cannot shut his mind. Side effects, risks versus benefits of treatment with psychotropics and alternatives to the treatment were discussed with the patient. Risk of not receiving any treatment was also discussed with the patient. After discussion, we mutually decided to continue with the current treatment.
Supportive psychotherapy.
Unit milieu.
After discharge, patient to follow at the Community Mental Health Center or a psychiatrist of his choice.
Patient also has legal charges against him through the State of Michigan 38th Judicial Circuit, and count one is home invasion, first degree, and count two is assault with a dangerous weapon (felonious assault).
[signed] Agha Shahid, M.D., 3/31/7

 See People v Carter, 462 Mich 206, 214; 612 NW2d 144 (2000) (“Counsel may not harbor error as an appellate parachute.”).

 Melendez-Diaz v Massachusetts, 557 US 305, 312 n 2; 129 S Ct 2527; 174 L Ed 2d 314 (2009).

 Justice Scalia’s majority opinion, written on behalf of five justices, expressly stated that “medical reports created for treatment purposes . .. would not be testimonial under our decision today.” Id. Justice Kennedy’s dissenting opinion, written on behalf of the remaining four justices, would have limited testimonial statements to those “ ‘produced by, or with the involvement of, adversarial government officials responsible for investigating and prosecuting crime.’ ” Id. at 346 (Kennedy, J., dissenting), quoting Comment, Toward a definition of “testimonial": How autopsy reports do not embody the qualities of a testimonial statement, 96 Cal L R 1093, 1118 (2008).

 Crawford v Washington, 541 US 36, 60 n 9; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

 Defendant’s son was a passenger in a vehicle that was involved in a single-car accident. Krell was the driver of a second automobile that had been chasing the vehicle in which defendant’s son was a passenger. Krell was convicted of negligent homicide for the death of defendant’s son in that accident. Defendant testified that he was angry with Krell and that he “wanted to see him live in a cardboard box [for] the rest of his life.” Defendant also admitted that, long before the March 2007 events resulting in his conviction, he harbored thoughts of confronting Krell and causing him physical pain. Krell testified that defendant had previously “lunged” at him during Krell’s criminal trial.

 Although defendant testified that he did not remember what occurred on the afternoon and evening of March 28, 2007, he did not dispute the testimony of Krell or Krell’s neighbor.

 Krell testified that, after leaving his neighbor’s house and calling 911 himself, he watched defendant enter his car, back out of Krell’s driveway, and drive away from Krell’s house.

 Defendant’s brother and mother subsequently drove to a nearby quarry, and his brother threw the pistol into deep water at the quarry.

 MCL 750.110a(2).

 MCL 750.82.

 MCL 750.227b.

 The prosecutor presented no expert witness in his case-in-chief and had rested when defendant began his ease-in-chief and presented his expert witness.

 People v Ginther, 390 Mich 436; 212 NW2d 922 (1973).

 As the first proponent of the evaluation at trial, defense counsel’s reaction to the Confrontation Clause claim advanced here is entirely understandable. The attempt to convert the use of this evaluation advanced by defendant himself into a Confrontation Clause violation seems plausible only to the majority.

 Not to be overlooked is the fact that defense counsel concluded that the entire evaluation, when considered as a whole, undermined the insanity defense that he was presenting and that Dr. Shahid probably would not have supported defendant’s legal insanity defense. Defense counsel’s trial strategy, therefore, was to minimize the importance of the evaluation, notwithstanding that his own expert selectively relied on it in formulating his opinion that defendant was legally insane.
Under the circumstances, it was entirely understandable why defense counsel would choose to rely on his own expert’s opinion rather than *571 jeopardize that opinion and the insanity defense by calling Dr. Shahid as a witness merely to authenticate his evaluation or to comply with MRE 703. Nor, for similar reasons, would defense counsel want to insist that the prosecutor call Dr. Shahid as a witness: once on the stand, Dr. Shahid would he subject to examination by the prosecutor and would undermine the insanity defense. The majority is apparently unconcerned about this very obvious trial strategy choice. The question is why.

 People v LeBlanc, 465 Mich 575, 579; 640 NW2d 246 (2002).

 Id.

 US Const, Am VI. The Michigan Constitution’s parallel provision uses nearly identical language. Const 1963, art 1, § 20 (“In every criminal prosecution, the accused shall have the right... to have the assistance of counsel for his or her defense ....”). This Court has held that the Michigan Constitution “does not afford greater protection than federal precedent with regard to a defendant’s right to counsel when it involves a claim of ineffective assistance of counsel.” People v Pickens, 446 Mich 298, 302; 521 NW2d 797 (1994).

 Strickland v Washington, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984), quoting McMann v Richardson, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970).

 Strickland, 466 US at 687.

 Illinois v Allen, 397 US 337, 342-343; 90 S Ct 1057; 25 L Ed 2d 353 (1970), quoting Snyder v Massachusetts, 291 US 97, 106; 54 S Ct 330; 78 L Ed 674 (1934).

 United States v Lee, 374 F3d 637, 650 (CA 8, 2004), citing Loggins v Frey, 786 F2d 364, 368 (CA 8, 1986). “Circumstances are exceptional when a defendant has not personally waived nor acquiesced in an attempted waiver by counsel.” Lee, 374 F3d at 650.

 United. States v Lopez-Medina, 596 F3d 716, 731 (CA 10, 2010). I do not concede that the prosecutor’s rebuttal was an “otherwise inadmissible” line of questioning; however, this decision provides further support for the conclusion that defendant affirmatively waived cross-examination of Dr. Shahid.

 There is no evidence that defendant disagreed with his attorney’s strategy. To the contrary, tried counsel admitted at the Ginther hearing that “[w]e had a discussion as to whether or not to .. . present Dr. Shahid” as a witness.

 For the reasons stated in part III(D) of this opinion, this trial strategy was objectively reasonable.

 Pointer v Texas, 380 US 400, 406; 85 S Ct 1065; 13 L Ed 2d 923 (1965). The Michigan Constitution’s parallel provision uses nearly identical language. Const 1963, art 1, § 20 (“In every criminal prosecution, the accused shall have the right... to he confronted with the witnesses against him or her ....”).

 Crawford, 541 US at 50.

 Id. at 53-54 (emphasis added).

 For example, in Ohio v Roberts, the Supreme Court explained the Confrontation Clause as follows: “Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that ‘there is no material departure from the reason of the general rule.’ ” Ohio v Roberts, 448 US 56, 65; 100 S Ct 2531; 65 L Ed 2d 597 (1980), overruled by Crawford, 541 US 36, quoting Snyder, 291 US at 107.

 Crawford, 541 US at 61. In abrogating the Roberts test, the Crawford Court explained that Roberts “departs from the historical principles” of *576 the Confrontation Clause because it “admits statements that. .. consist of ex parte testimony upon a mere finding of reliability.” Id. at 60.

 Ante at 562.

 Ante at 562.

 Crawford, 541 US at 51, quoting 2 Webster, An American Dictionary of the English Language (1828).

 Crawford, 541 US at 68.

 Melendez-Diaz, 557 US at 312 n 2.

 Crawford, 541 US at 51, quoting 2 Webster, An American Dictionary of the English Language (1828) (alteration in Crawford) (emphasis added).

 Crawford, 541 US at 51.

 Id.

 Id. at 68.

 Notwithstanding the majority’s characterization to the contrary, this articulation is less a strict “ ‘two-part test,’ ” ante at 555, than a summation of factors that the United States Supreme Court has considered most relevant in determining whether a statement is testimonial for confrontation purposes. The majority is correct that this summation is an “attempt to synthesize several very-difficult-to-synthesize Confrontation Clause decisions of the Supreme Court,” ante at 555, but as the analysis in this opinion indicates, I believe that those decisions contain a consistent pattern and that, as a result, some meaning can — and must — be given to those decisions.

 Melendez-Diaz, 557 US at 310. And even if formality “is not the sole touchstone” in the inquiry into whether a statement is testimonial, Michigan v Bryant, 562 US_,_; 131 S Ct 1143, 1160; 179 L Ed 2d 93 (2011), “a statement’s formality or informality can shed light on whether a particular statement has a primary purpose of use at trial,” Bullcoming v New Mexico, 564 US_,_; 131 S Ct 2705, 2721; 180 L Ed 2d 610 (2011) (Sotomayor, J., concurring).

 Melendez-Diaz, 557 US at 311, quoting Mass Gen Laws, ch 111, § 13; see also Bullcoming, 564 US at_; 131 S Ct at 2716 (stating that “[t]he same purpose [as the certificate in Melendez-Diaz] was served by the certificate in question here”); accord id. at _; 131 S Ct at 2722 (Sotomayor, J., concurring) (“[T]his is not a case in which the State suggested an alternate purpose, much less an alternate primary purpose, for the [blood alcohol concentration] report.”).

 Davis v Washington, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006); see also Bryant, 562 US_; 131 S Ct 1143.

 Melendez-Diaz, 557 US at 312 n 2.

 Ante at 550, quoting Melendez-Diaz, 557 US at 312 n 2.

 Ante at 550.

 Melendez-Diaz, 557 US at 335 (Kennedy, J., dissenting) (“It is difficult to confine at this point the damage the Court’s holding will do in other contexts.”).

 The majority itself affirms this proposition in its discussion of the recent decision in Bullcoming, stating that the Bullcoming Court “clearly reconfirmed that the Confrontation Clause bars the admission of a scientific report, prepared in connection with a criminal investigation or prosecution ...Ante at 555 (emphasis added). The majority, however, reads Bullcoming too broadly when it would apply Bullcoming’s analysis to statements prepared for purposes other than to aid a criminal investigation or prosecution. Bullcoming simply does not apply to cases like defendant’s.

 Melendez-Diaz, 557 US at 312 n 2.

 People v Cage, 40 Cal 4th 965, 986; 56 Cal Rptr 3d 789; 155 P3d 205 (2007).

 Hartsfield v Commonwealth, 277 SW3d 239, 244 (Ky, 2009).

 State v Stahl, 111 Ohio St 3d 186; 2006-Ohio-5482; 855 NE2d 834 (2006).

 Id. at 196-197.

 Id. at 198.

 Ante at 559.

 Hartsfield, 277 SW3d at 244. While these eases from other courts apply the purpose analysis to victims’ treatment for injuries, rather than to defendants’ treatment, this distinction is without a difference because courts are required to examine the declarant’s purpose when determin *582 ing whether the statement was made for the purposes of medical treatment. Davis, 547 US at 823 n 1 (“[I]t is in the final analysis the declarant’s statements, not the interrogator’s questions, that the Confrontation Clause requires us to evaluate.”). A declarant-victim telling a doctor what occurred so the doctor can treat her is in no different a position than a declarant-doctor documenting a medical evaluation so he can treat a criminal defendant.

 Bryant, 562 US_131 S Ct 1143.

 The majority criticizes this opinion for not limiting inquiry into the primary purpose of a statement to the narrow question “whether statements made to the police in the very specific context of an ongoing emergency were testimonial. . . Ante at 558. However, the majority’s narrow approach ignores the fact that cases in addition to Davis and Bryant have considered a statement’s purpose in determining whether its introduction violates the Confrontation Clause. Indeed, in Melendez-Diaz, it was not just the “primary” purpose of the affidavits identifying the tested substance that they be used at trial, but it was their “sole purpose.” Melendez-Diaz, 557 US at 311 (emphasis omitted).

 Formality in the confrontation context corresponds to a statement’s specific role within the investigative or prosecutorial process. Justice Thomas perhaps articulated this principle most clearly in his separate *583 Melendez-Diaz opinion, wherein he explained that “ ‘the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.’ ” Melendez-Diaz, 557 US at_; 129 S Ct at 2543 (Thomas, J., concurring) (emphasis added), quoting White v Illinois, 502 US 346, 365; 112 S Ct 736; 116 L Ed 2d 848 (1992) (Thomas J., concurring).

 In concluding that Dr. Shahid’s evaluation was testimonial, the Court of Appeals operated under the presumption that defendant, and not Dr. Shahid, was the declarant. “[L]ike a statement taken by a police officer during a custodial interrogation, the statements attributed to defendant by Dr. Shahid appear to he responses to questions posed by Dr. Shahid for purposes of defendant’s psychiatric examination.” People v Fackelman, unpublished opinion per curiam of the Court of Appeals, issued August 27, 2009 (Docket No. 284512), p 2. The Court of Appeals erred in presuming that defendant was the “declarant” for the purposes of his Confrontation Clause challenge. Dr. Shahid was the declarant whose diagnosis of defendant is at issue in this appeal.

 I agree with the majority that “the circumstances and context in which the statement was made are highly relevant, if not determinative, in deciding whether its admission offends the Confrontation Clause.” Ante at 560. This is precisely why the purpose of a statement’s creation matters so much to the inquiry into whether a statement is testimonial, and why this dissent’s analysis focuses on the context and contents of Dr. Shahid’s evaluation. By contrast, the majority opinion focuses on how that evaluation, once produced for any reason unrelated to litigation, might likely he used in a future criminal prosecution.

 Hartsfield, 277 SW3d at 244.

 Ante at 533.

 See ante at 552-554.

 Ante at 553.

 Commonwealth v Baumhammers, 599 Pa 1, 60 n 28; 960 A2d 59 (2008) (explaining that statements made to an expert witness hy the defendant’s former psychologist, among other statements, were “not ‘testimonial’ hearsay as contemplated by the Court in Crawford”).

 See n 3 supra.

 Ante at 533, quoting Crawford, 541 US at 51.

 The majority treats as controlling a standard that the United States Supreme Court has not adopted, applying one of the three possible formulations that the Crawford Court noted had heen used to define testimonial statements. However, the Crawford Court expressly declined to choose one of the three methods as controlling, noting only that “interrogations by law enforcement officers fall squarely within” the class of testimonial statements, however it is defined. Crawford, 541 US at 53. Moreover, one of the other formulations that the Crawford Court identified as a potential definition of “testimonial” — “ ‘extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,’ ” id. at 51-52, quoting White, 502 US at 365 (Thomas, J., concurring) — leads to the result of this dissenting opinion, not the majority’s result. Contrary to the majority’s observation, see ante at 557 n 35, the Crawford majority, including Justice Thomas, concluded that this narrowest definition of “testimonial” included the statements at issue in Crawford. Thus, if it is “hardly fatal” to the majority’s position that this *588 alternative formulation would result in the conclusion that the statement at issue in this case was not testimonial, ante at 557 n 35, then it is equally nonfatal to this dissent’s position that the majority’s preferred formulation would lead to the conclusion that the statement at issue in this case was testimonial. In short, because Crawford’s various potential definitions of “testimonial” do not lead to a clear result one way or the other regarding how to apply the Confrontation Clause in this case, we must examine how the Court has applied and refined its understanding of the Confrontation Clause after Crawford.
The majority claims that Melendez-Diaz employed its preferred test “to ascertain that the statement at issue was testimonial!.]” Ante at 532. However, like the Crawford Court, the Melendez-Diaz Court reiterated the fact that “ ‘[v]arious formulations of this core class of testimonial statements exist,’ ” without expressly adopting one. Melendez-Diaz, 557 US at 310, quoting Crawford, 541 US at 51.

 Crawford, 541 US at 60 n 9, citing Tennessee v Street, 471 US 409, 414; 105 S Ct 2078; 85 L Ed 2d 425 (1985).

 Ante at 531 n 10.

 MCL 768.21a(3).

 Ante at 530.

 In order to prove legal insanity, MCL 768.21a(1) requires a showing that the defendant “lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law.” I agree with the majority’s observation that “[a]t trial, the medical term that both testifying experts used as shorthand for describing legal insanity was ‘psychosis Ante at 529. See also 2 Shorter Oxford English Dictionary (6th ed), p 2392 (defining “psychosis” as “severe mental illness, derangement, or disorder involving a loss of contact with reality”).

 Importantly, the prosecutor’s entire cross-examination did not involve Dr. Shahid’s evaluation; rather, the entire cross-examination was focused on impeaching Dr. Mistry’s opinion. The prosecutor raised other points completely unrelated to Dr. Shahid’s evaluation in an effort to show that Dr. Mistry’s opinion did not incorporate relevant data. For instance, the prosecutor elicited testimony from Dr. Mistry that he did not view the video captured by a home-surveillance system that “shows, at least partially, what the Defendant was actually doing at the time of the crime,” although Dr. Mistry admitted that review of that video “would be helpful” to any conclusion regarding defendant’s state of mind at the time of the crime. The prosecutor also questioned Dr. Mistry regarding defendant’s behavior at his mother’s house, including defendant’s actions to conceal the gun in his mother’s heat register. Dr. Mistry *591 explained that, while he had not interviewed defendant’s mother, he was aware that defendant “put the gun at his mother’s house” and explained that a “deliberate effort to conceal” the gun would be a significant fact in evaluating defendant’s mental status at the time of the crimes.

 See CJI2d 3.5(2) and (5).

 People v Graves, 458 Mich 476, 486; 581 NW2d 229 (1998).

 People v Snider, 239 Mich App 393, 425; 608 NW2d 502 (2000) (“Trial counsel is not required to advocate a meritless position.”); see also People v Riley (After Remand), 468 Mich 135, 142; 659 NW2d 611 (2003).

 It is also undisputed that the two expert witnesses in this case were qualified to give testimony pursuant to the requirements of MRE 702. These requirements would only be relevant to Dr. Shahid if he were “a witness” who “testif[ied] ... in the form of an opinion . ...” MRE 702. Because I conclude that Dr. Shahid’s evaluation was not testimonial, MRE 702 is inapplicable to whether his evaluation would be admissible under our hearsay rules.

 Contrary to the majority’s conclusion, an expert may form his opinion “on historical data, including information and opinions contained in prior competency evaluations, when forming an opinion regarding a defendant’s criminal responsibility.” People v Dobben, 440 Mich 679, 698; 488 NW2d 726 (1992) (emphasis added). Thus, the fact of Dr. Shahid’s diagnosis was one of several pieces of data contained within his evaluation and would not have to be redacted under MRE 703, as the majority suggests. Moreover, even if Dr. Shahid’s diagnosis that defendant did not suffer from psychosis had not been a basis for the defense expert’s witness, the rule of completeness, MRE 106, would have required that the entire evaluation be introduced into evidence because it “ought in fairness ... be considered contemporaneously with” the rest of the evaluation.

 Although the Dobben Court ruled that “[a]n expert witness may also base his opinion on hearsay information,” id. at 695-696, I note that this Court last interpreted the intersection of our hearsay rules with MRE 703 before the 1995 and 2003 amendments of MRE 703. Before these amendments, MRE 703 provided, in relevant part, “The court may require that underlying facts or data essential to an opinion or inference be in evidence.” 402 Mich cx (1978) (emphasis added). Thus, before the amendments, MRE 703 gave the trial court discretion whether to require that the facts and data underlying an expert opinion be admitted into evidence. Because I conclude that an exception to the hearsay rules allows for the introduction of Dr. Shahid’s evaluation, I need not determine whether that portion of Dobben remains viable in light of the amendments of MRE 703, and I would leave that determination to another day.

 MRE 802.

 MRE 801(c).

 However, defendant’s statements contained within Dr. Shahid’s evaluation are not hearsay-within-hearsay because they are defendant’s own statements. MRE 801(d)(2)(A). Moreover, even if they are hearsay, they are “Statements made for purposes of medical treatment,” MRE 803(4), and are therefore not excluded by the hearsay rule.

 Although the prosecutor asserted in closing argument that “it’s real important to look at what Dr. Shahid had to say,” the prosecutor’s initial use of Dr. Shahid’s evaluation was to impeach the credibility of defendant’s expert witness and the prosecutor’s direct examination of his expert witness sought to explain the foundation of his expert’s opinion. As stated earlier in this opinion, even if the prosecutor sought to use the evidence to prove the truth of the matter asserted in his closing argument, the trial court’s instruction to the jury that “[t]he lawyers’ statements and arguments are not evidence,” that “[tjhey’re only meant to help you understand the evidence and each side’s legal theories,” and that the jury “should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge” properly insulated the jury from any inappropriate use of Dr. Shahid’s evaluation during closing argument.

 MRE 803(6) refers to the custodian’s role to testify regarding whether the business record was “kept in the course of a regularly conducted business activity” and whether it “was the regular practice of that business activity to make the memorandum, report, record, or data compilation . .. It does not refer to additional questions that the majority raises, such as those questions regarding the substance of Dr. Shahid’s evaluation: whether psychiatric evaluations compiled in the regular practice of treating patients “often refer to a patient’s pending criminal charges” or whether doctors creating those evaluations “typically review other materials, such as police reports ... Ante at 536-537 n 15. These questions appear to be outside the scope of what a custodian of records would be expected to know and certainly beyond the scope of MRE 803(6).

 MRE 703.

 This dissent does not suggest that the authentication requirement must “be stricken from” MRE 803(6), ante at 536 n 15. Rather, this dissent concludes that any failure to authenticate Dr. Shahid’s evaluation *598 cannot inure to defendant’s benefit because his own expert admitted using Dr. Shahid’s evaluation in forming his own expert opinion and, therefore, the evaluation was required to be placed into evidence by defendant pursuant to MRE 703. Simply put, defendant cannot benefit from his own failure to introduce the evaluation.

 Strickland., 466 US at 687.

 Id. at 689.

 Id.

 Id., quoting Michel v Louisiana, 350 US 91, 101; 76 S Ct 158; 100 L Ed 83 (1955).

 MCL 768.21a(3).

 Presumably, this potentially damaging testimony would have included issues that the majority is curious about, such as whether Dr. Shahid’s “rationale [would not be] viewed as compelling,” whether “his diagnosis of ‘no psychosis’ did not necessarily mean that defendant was not legally insane at the time of the incident,” whether “the prosecutor’s expert had misinterpreted his diagnosis,” or whether “he .. . just [would have heen] an ineffectual witness!.]” Ante at 563-564 n 41. Notwithstanding the majority’s curiosity, one thing is certain: defense counsel did not want the jury to hear Dr. Shahid’s answers to these questions.

 The majority makes much of defense counsel’s claim at the Ginther hearing that he did not consider the references to Dr. Shahid’s evaluation a confrontation violation. To begin with, counsel did not err in failing to recognize a confrontation violation because there was no confrontation violation to recognize. But even if defendant had a right to confront Dr. Shahid, defense counsel’s unequivocal trial strategy sought to downplay Dr. Shahid’s opinion of defendant’s mental state and in fact resulted in the affirmative decision not to call Dr. Shahid as a witness.

 Strickland, 466 US at 689.

 Id.

 Because I conclude that defense counsel did not render constitutionally deficient assistance of counsel by failing to object to the use of Dr. Shahid’s evaluation on Confrontation Clause grounds, I need not engage in the second prong of the Strickland ineffective assistance analysis: the potential prejudicial effect of the claimed error. Accordingly, I neither agree nor disagree with the majority’s analysis regarding whether the alleged confrontation error resulted in prejudice requiring reversal.

 Ante at 544; see also MCL 768.21a(3).

 Ante at 544.

 Melendez-Diaz, 557 US at 312 n 2.